**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 2 7 2022

**TAMMY H. DOWNS, CLERK**
By:_____
                          **DEP CLERK**

RYAN FRAYER and TANIKA PARKER,
individually and on behalf of the DRIV 401(K)
RETIREMENT SAVINGS PLAN, and all
others similarly situated,

*Plaintiffs,*

v.

TENNECO INC.; DRIV AUTOMOTIVE INC.;
TENNECO AUTOMOTIVE OPERATING
COMPANY INC.; THE TENNECO
BENEFITS COMMITTEE; and JOHN AND
JANE DOE DEFENDANTS 1-30,

*Defendants.*

Case No. 3:22-cv-132-DPM

**COMPLAINT - CLASS ACTION**

This case assigned to District Judge _Marshall_
and to Magistrate Judge _Ray_

## INTRODUCTION

Plaintiffs, Ryan Frayer and Tanika Parker ("Plaintiffs"), individually and on behalf of the

DRiV 401(k) Retirement Savings Plan (the "Plan") and a class of similarly situated participants in

and beneficiaries of the Plan, bring this class action pursuant to the Employee Retirement Income

Security Act of 1974, as amended ("ERISA"), against the Plan's fiduciaries, including DRiV

Automotive Inc., Tenneco Automotive Operating Company Inc., the Tenneco Benefits

Committee, and John and Jane Does 8–30 (collectively "Defendants") for breaches of their

fiduciary duties.

Plaintiffs bring this action by and through their undersigned attorneys based upon personal

knowledge, information contained in the Plan's publicly available Form 5500 series filings with

the United States Department of Labor, the account information and statements provided to them

as participants in the Plan, and other information publicly available or obtained through counsel's

preliminary investigation. Plaintiffs anticipate that discovery will uncover further support for the allegations in the Complaint, and, potentially, for additional claims.

As described herein, Defendants have breached their fiduciary duties to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiffs bring this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA. Plaintiffs bring this action and request this relief for the benefit of the Plan and its participants and beneficiaries.

In support of their claims, Plaintiffs state and allege as follows:

### NATURE OF THE CASE

1.      This is a civil enforcement action brought on behalf of the Plan pursuant to the applicable provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 et seq. ("ERISA").

2.      This class action concerns the Plan and is brought on behalf of all persons who were and/or are participants in and beneficiaries of the Plan at any time during the six-year period preceding the filing of the original Complaint and up through the present (the "Class Period").

3.      The Defendants were fiduciaries of the Plan during the Class Period. Tenneco Inc., DRiV Automotive Inc. ("DRiV"), Tenneco Automotive Operating Company Inc. ("TAOC"), the Tenneco Benefits Committee (the "Committee"), and the individual members of the Committee were responsible for selecting, monitoring, and removing investment options made available to DRiV Plan participants, as well as controlling and accounting for expenses of the Plan.

4.      The fiduciary obligations of plan fiduciaries to the participants and beneficiaries of an ERISA-governed plan are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602 (8th Cir. 2009).

2

5. Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

6. When selecting and monitoring investment options and service providers for an ERISA-governed plan, the plan's fiduciaries are required to act for the exclusive benefit of the plan and its participants and beneficiaries, perform with undivided loyalty, act prudently, defray reasonable plan expenses, diversify investments to minimize large losses unless clearly prudent not to do so, and discharge their duties in accordance with the governing documents and instruments so long as they are consistent with ERISA. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

7. Here, Defendants failed to fulfill these duties.

8. During the Class Period, Defendants could have leveraged the Plan's assets to qualify for lower-cost versions of the same investments, chosen less costly and equally or better-performing investment options for the Plan, and used the Plan's size to reduce recordkeeping fees.

9. Plaintiffs bring this action to remedy the losses the Plan sustained as a result of these and other fiduciary breaches by Defendants and to obtain such further equitable or remedial relief as may be appropriate to redress and to enforce the provisions of ERISA.

10. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed, including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of the Plan's investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts and separate accounts and market-rate recordkeeping costs.

3

11.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments, because this information is solely within the possession of Defendants prior to discovery. *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

12.     Having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.

13.     Plaintiffs did not and could not review the meeting minutes or other evidence of Defendants' fiduciary decision-making process, or the lack thereof.

14.     This Complaint is based upon reasonable inferences drawn from the facts set forth herein.

## THE PARTIES

15.     Plaintiff Ryan Frayer is a resident of Paragould, Arkansas and a former employee of DRiV who participated in the Plan during the Class Period and suffered harm as a result of Defendants' respective breaches of their fiduciary duties under, and violations of, ERISA.

16.     Plaintiff Frayer invested in at least 14 different investment options offered by the Plan during the Class Period, including many of the options specifically identified below as imprudent. Accordingly, he has suffered personal injury in fact, including but not limited to injury from the imprudent menu of investment options offered in the Plan, as well as monetary injury in the form of diminution of the value of his assets in the Plan (due to excessive management fees in overpriced funds, excessive overall recordkeeping fees, and lost gains due to underperformance),

as a result of Defendants' breaches of their fiduciary duties of prudence and loyalty as alleged below.

17.     Plaintiff Tanika Parker is a resident of Kennett, Missouri and a current employee of DRiV who participated in the Plan during the Class Period, continues to participate in the Plan, and suffered harm as a result of Defendants' respective breaches of their fiduciary duties under, and violations of, ERISA.

18.     Plaintiff Parker invested in at least 16 different investment options offered by the Plan during the Class Period, including many of the options specifically identified below as imprudent. Accordingly, she has suffered personal injury in fact, including but not limited to injury from the imprudent menu of investment options offered in the Plan, as well as monetary injury in the form of diminution of the value of her assets in Plan (due to excessive management fees in overpriced funds, excessive overall recordkeeping fees, and lost gains due to underperformance), as a result of Defendants' breaches of their fiduciary duties of prudence and loyalty as alleged below.

19.     Tenneco Inc., a Delaware corporation, is a publicly-traded company (NYSE: TEN) with its principal place of business in Lake Forest, Illinois. Tenneco Inc. is "one of the world's leading designers, manufacturers and marketers of automotive products for original equipment and aftermarket customers, with full year 2021 revenues of $18 billion and approximately 71,000 team members working at more than 260 sites worldwide."[1]

---

[1] *About Tenneco*, https://www.tenneco.com/who-we-are (last visited May 10, 2022).

20.     DRiV Automotive Inc. ("DRiV"), a Delaware corporation, is the current sponsor for the Plan, according to the Plan's 2020 Form 5500 filed with the U.S. Department of Labor. DRiV is a subsidiary and division of Tenneco Inc.[2] DRiV's headquarters is in Lake Forest, Illinois.

21.     Tenneco Automotive Operating Company Inc. ("TAOC"), a Delaware corporation, was the sponsor for the Plan prior to 2020, according to the Plan's Form 5500s filed with the U.S. Department of Labor for years 2016, 2017, 2018, and 2019. TAOC is a subsidiary of Tenneco Inc. And TAOC's headquarters is located in Lake Forest, Illinois.

22.     Upon information and belief, Defendant Tenneco Benefits Committee ("the Committee"), also referred to as Tenneco Benefits & Pension Investment Committee,[3] was appointed by DRiV and TAOC to help carry out the Plan's administrative functions and to assist the companies as the plan administrator for each plan.

---

[2] *See An Introduction to DRiV*, https://www.driv.com/ (last visited May 10, 2022); *DRiV History*, https://www.driv.com/our-company/our-history.html (last visited May 10, 2022).

[3] On the Plan's Form 5500s (for 2016-2020), the plan administrator is identified as "Tenneco Benefits Committee" at 500 North Field Drive, Lake Forest, Illinois 60045-2595. The administrator's EIN is 74-1933558. *See* December 31, 2020 Form 5500 of the DRiV 401(k) Retirement Savings Plan filed with the United States Department of Labor ("DRiV 2020 Form 5500"), at 1–2. A recent Form 11-K filing with the U.S. Securities and Exchange Commission, however, shows the plan administrator as the "Tenneco Benefits and Pension Investment Committee." *See* June 25, 2021 Form 11-K of the DRiV 401(k) Retirement Savings Plan filed with the United States Securities and Exchange Commission ("DRiV Form 11-K"), at 13. Though the names are stated differently on the Form 5500 and the 11-K, the Tenneco Benefits Committee and the Tenneco Benefits and Pension Investment Committee appear to be one and the same. TAOC is the plan sponsor for another 401(k) plan—the Tenneco 401(k) Investment Plan. On the Tenneco 401(k) Investment Plan's 2020 Form 5500, the plan administrator is identified as "Tenneco Benefits & Pension Investment Committee," located at the same address and with the same EIN as the Tenneco Benefits Committee. *See* DRiV 2020 Form 5500, at 1-2; December 31, 2020 Form 5500 of the Tenneco 401(k) Investment Plan filed with the United States Department of Labor ("Tenneco 401(k) Investment Plan 2020 Form 5500"), at 1–2.

23. Upon information and belief, Tenneco Inc. has authority to appoint the individual members of the Committee, which also serves as the plan administrator for other plans sponsored by subsidiaries of Tenneco Inc.

24. Defendants DRiV, TAOC, and the Committee, may be served with process by certified mail to the entities' registered agent, Corporate Creations Network Inc., 350 S. Northwest Highway, Suite 300, Park Ridge, Illinois 60068.

25. Defendant Tenneco Inc. may be served with process by certified mail to its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

26. Defendants John and Jane Does 1–30 are the individuals who are or were members of the Committee and were or are responsible for administering Plan.

27. As such, Defendants John and Jane Does 1–30 are or were the individuals or part of the group that was delegated control over the management of the Plan and its assets, including selecting and regularly monitoring the investment options in the Plan and the performance and costs of those investment options, comparing them to other better-performing or less-costly alternatives, choosing and overseeing the Plan's third-party administrator, custodian, trustee, recordkeeper, and other service providers, and monitoring the compensation and minimizing the costs of such third-party services.

28. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

7

29.     ERISA treats as fiduciaries not only persons expressly named as fiduciaries under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.

30.     Defendants are, or during the Class Periods, were fiduciaries of the Plan under ERISA.

31.     Defendants were fiduciaries of the Plan because they were so named; they exercised authority or control respecting management or disposition of the Plan's assets; they exercised discretionary authority or discretionary control respecting management of the Plan; or they had discretionary authority or discretionary responsibility in the administration of the Plan.

### JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

33.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

34.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### ERISA'S FIDUCIARY STANDARDS

8

35.     To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary

duties of loyalty, prudence, diversification, and compliance with the plan document upon plan

fiduciaries. 29 U.S.C. § 1104(a)(1). These fiduciary duties apply to Defendants because they are

or were fiduciaries of the Plan during the Class Period.

36.     ERISA § 404(a)(1), 29 U.S.C.§ 1104(a)(1), imposes a "prudent person" standard

of care on plan fiduciaries:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest
> of the participants and beneficiaries and—
>
> (A)     for the exclusive purpose of:
>
> > (i)     providing benefits to participants and their beneficiaries; and
> > (ii)    defraying reasonable expenses of administering or ;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then
> prevailing that a prudent man acting in a like capacity and familiar with such
> matters would use in the conduct of an enterprise of like character and with like
> aims;
>
> (C)     by diversifying the investments of the plan so as to minimize the risk of
> large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D)     in accordance with the documents and instruments governing the plan
> insofar as such documents and instruments are consistent with the provisions of this
> title and title IV.

37.     ERISA also imposes co-fiduciary duties on plan fiduciaries. ERISA § 405, 29

U.S.C. § 1105, states in relevant part that:

> In addition to any liability which he may have under any other provision of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act
> or omission of such other fiduciary, knowing such act or omission is a
> breach;

9

(2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

38.     Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments must act prudently and solely in the interest of participants and beneficiaries of the plan.

39.     Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings 401(k) Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

40.     Indeed, fiduciary decisions may dramatically affect the amount of money participants save for retirement.

41.     For example, an illustration from the Department of Labor shows that a 1% difference in fees over a person's career makes a 28% difference in retirement savings. U.S. Dept. of Labor, *A Look at 401(k) Plan Fees*, at 2 (Sept. 2019).

42.     An ERISA fiduciary has a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 575 U.S. 523, 530, 135 S. Ct. 1823 (2015). Prudence requires a review at "regular intervals." *Id.* at 1828.

43.     As the Department of Labor explains:

[T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

44.     And, as explained very recently by the U.S. Supreme Court in *Hughes v. Northwestern University*, plan fiduciaries may not simply provide a menu of options, some of which are prudent, and rely "on the participants' ultimate choice" from that menu to excuse their imprudent decisions. 595 U.S. ___, 142 S. Ct. 737, 741–42 (2022). Citing *Tibble v. Edison International*, the U.S. Supreme Court noted that, "even in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.* at 738–39 (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30, 135 S. Ct. 1823 (2015)). If, the Court explained, the fiduciaries "fail to remove an imprudent investment from the plan within a reasonable time," they breach their duty. *Id.*

45.     Notably, in *Hughes* the Supreme Court clearly applied *Tibble* to the pleading standards for a wide range of alleged plan deficiencies, including allegations that fiduciaries "failed to monitor the Plans' investments in a number of ways, including by retaining recordkeepers that charged excessive fees, offering options likely to confuse investors, and neglecting to provide cheaper and otherwise-identical alternative investments." *Hughes*, 142 S. Ct. at 741–42. Thus, the pleading standard for all of these issues should be governed by *Hughes*.

46.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries, as the Department of Labor has explained:

> [T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and beneficiaries, as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. In other words, in deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by

11

non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988).

47.    In a separate publication, the Department of Labor further explains:

The Federal law governing private-sector plan, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing a plan – referred to as fiduciaries – carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.

. . . .

Plan fees and expenses are important considerations for all types of plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

. . . .

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

U.S. Dep't of Labor Emp. Benefits Sec. Admin., *Understanding Retirement Plan Fees and Expenses* 1–2, 4 (2011).

## GENERAL ALLEGATIONS

48.    The Plan is a "defined contribution" plan under ERISA.

49.　　A defined contribution plan is a type of retirement plan in which the employer, employee, or both make contributions on a regular basis, individual accounts are set up for participants, and benefits are based on the amounts credited to these accounts (through employee contributions and, if applicable, employer contributions), plus any investment earnings on the money in the account.

50.　　In a defined contribution plan, each participant has an individual account and directs plan contributions into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525, 135 S. Ct. 1823 (2015).

51.　　Contributions to the Plan are made in the form of salary deferral contributions by individual employee participants, through the participant's employer in the form of employer matching contributions, and through profit-sharing contributions.

52.　　Defendants selected and retained various investment options made available to participants in the Plan and chose the recordkeeper for the Plan.

53.　　At the choice and discretion of Defendants, various investment options were made available to participants in the Plan.

54.　　As of December 31, 2019, for example, the Plan included 26 investment options: 23 mutual funds; one collective investment trust fund; Tenneco Common Stock Fund, and a Self-Directed Brokerage Account.

55.　　The fiduciaries have exclusive control over this menu of investment alternatives available to plan participants.

13

56.     Each investment alternative has its own fees, typically expressed as a percentage of assets under management, or expense ratio. If, for example, a fund charges 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points. The fees deducted from a fund's assets reduce the value of the shares, and thus reduce the returns participants receive on their investments.

57.     These Plan expenses can "significantly reduce the value of an account in a defined-contribution plan." *Id.*

58.     The fees assessed to participants are generally attributable to two types of services: plan administration and investment management.

59.     The Plan's fiduciaries have control over these expenses.

60.     The fiduciaries are responsible for hiring administrative service providers and negotiating and approving their compensation.

61.     As a result of the foregoing, these fiduciary decisions have the potential to dramatically affect the amount of money plan participants are able to save for retirement, and fiduciaries must engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees.

62.     This duty to engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees is particularly true for the Plan in this case, because it is a very large plan with the bargaining power and leverage to negotiate for and obtain the lowest fees.

63.     By December 31, 2019, the Plan had 15,333 participants with an account balance at year end and $1,163,574,939 in total assets, approximately $691,044,411 of which was invested in mutual funds.[4]

64.     According to the Plan's 2020 Form 5500, as of December 2020, the Plan had 10,085 participants with an account balance at year end, $893,536,564 in net assets, and 27 investment options: 24 mutual funds, one collective investment trust fund, Tenneco Common Stock Fund, and Self-Directed Brokerage Account.[5]

65.     Based on the most recent data available to Plaintiffs, the Plan would be in the top 0.2% of all 401(k) plans based on size, in terms of both plan assets and number of plan participants.[6]

66.     According to Morningstar, because the Plan has over $500 million in assets, it is considered a "Mega plan."[7]

67.     On October 1, 2018, Tenneco Inc. acquired Federal-Mogul LLC and, as a result of that acquisition, Tenneco Inc. inherited a 401(k) plan with substantial assets (the "Inherited Plan").[8] By December 31, 2019, the Inherited Plan had 6,090 participants (counting participants with an account balance at year end) and $548,435,544 in net assets, of which $525,720,887 was in collective investment trusts.[9] And by December 31, 2020, the Inherited plan had 9,482

---

[4] DRiV 2019 Form 5500, at 2 and Notes to Financial Statements, at 11, 13.

[5] DRiV 2020 Form 5500 at 2, Statements of Net Assets Available for Benefits at 4, and Supplemental Schedule H, Line 4i at 13–14.

[6] BRIGHTSCOPE, THE BRIGHTSCOPE/ICI DEFINED CONTRIBUTION PLAN PROFILE: A CLOSE LOOK AT 401(K) PLANS, 2018 7, EX. I.2 (July 2021).

[7] MORNINGSTAR CENTER FOR RETIREMENT &POLICY STUDIES, RETIREMENT PLAN LANDSCAPE REPORT 18, Ex. 9 (Mar. 2022).

[8] Tenneco 401(k) Investment Plan 2020 Form 5500, Notes to Financial Statements at 5. At the time of acquisition, the name of the Inherited Plan was "Federal-Mogul 401(k) Investment Plan."

[9] December 31, 2019 Form 5500 of the Federal-Mogul 401(k) Investment Plan filed with the

15

participants with an account balance at year end, $962,979,329 in net assets, and at least 22 investment options: 20 collective trust funds, Tenneco Common Stock fund, and a brokerage option.[10]

68.    Combined, the Plan and the Inherited Plan would be in the top 0.1% of all 401(k) plans based on either plan assets or number of participants based on the most recent data available to Plaintiffs.[11]

69.    Because of size of the Plan by itself, Defendants had and continue to have the ability to choose investments options not generally available and had and continue to have significant bargaining power with respect to the fees and expenses that were charged against participants' investments and the fees and expenses charged for recordkeeping services.

70.    Furthermore, the Committee, as the plan administrator for both the Plan and the Inherited Plan, could have used the assets of both plans, combined, for additional leverage and bargaining power to reduce the fees and expenses that were charged against participants' investments and the fees and expenses charged for recordkeeping services.

71.    But, as described below, despite the size of the Plan, Defendants did not take advantage of this leverage and bargaining power, nor did they take appropriate actions to reduce the Plan's investment and recordkeeping expenses, or exercise appropriate judgment to scrutinize each investment option that was offered in the Plans to ensure it was prudent.

***Defendants Failed to Properly Investigate and Select Lower Cost Investment Options for Plan Participants.***

---

United States Department of Labor ("Federal-Mogul 401(k) Investment Plan 2019 Form 5500") at 2, Statements of Net Assets Available for Benefits at 3, and Notes to Financial Statements at 9. Tenneco 401(k) Investment Plan 2019 Form 5500 at 2, Statements of Net Assets Available for Benefits at 3, and Notes to Financial Statements at 9.
[10] Tenneco 401(k) Investment Plan 2020 Form 5500 at 2, Statements of Net Assets Available for Benefits at 4, and Supplemental Schedule H, Line 4i at 13–14.
[11] *Id.*

72.     As the Plans' fiduciaries, Defendants must engage in a prudent and loyal process to select, monitor, remove, and retain the Plans' investment options.

73.     As noted above, under 29 U.S.C. § 1104(a)(1), Defendants must provide diversified investment options for the Plan. But diversification is not the only consideration for a prudent and loyal fiduciary.

74.     ERISA also requires Defendants to evaluate and monitor the fees and costs associated with the Plan's investment options and to give substantial consideration to those fees and costs when determining which options to remove or retain.

75.     As explained below, Defendants failed to offer the Plan's participants similar investment options to those in the Plan that were less costly and equally or better-performing, failed to take advantage of savings offered by lower cost share classes of mutual funds already in the Plan, and failed to consider investment vehicles with lower fees than those in the Plan, such as collective trusts (also called "collective investment trusts" and "collective trust funds").

76.     As a result of Defendants' systemic failure to properly investigate and select lower cost investment options for the Plan's participants (as explained in detail below), a substantial portion of the  menu of investment options was overpriced compared to the other options (lower price share classes of the same funds; lower price substantially similar alternative investments; and lower price collective trust versions of identical mutual funds) that prudent and loyal fiduciaries would have selected for the benefit of the Plans and their participants.

| Plan | | | | |
|------|------|------|------|------|
| Year | Number of Investment | Estimated Minimum | % of overpriced funds | Estimated % of assets in |

17

| | Options (excluding brokerage) | Number of overpriced funds | | overpriced funds |
|---|---|---|---|---|
| 2022 | 26 | 20 | 77% | Asset Information Not available |
| 2020 | 26 | 14 | 54% | 62% |
| 2019 | 25 | 12 | 48% | 44% |

77.     These numbers look similar for all other years in the Class Period.

78.     Had Defendants fulfilled their duties under ERISA and engaged in a prudent and loyal process to select, monitor, retain, and remove investment options from the Plan, these failures would not have occurred.

79.     Defendants' actions were contrary to the actions of a reasonable fiduciary and cost the Plans and their participants millions of dollars.

**The Defendants Failed to Offer the Collective Trust Version of the T. Rowe Price Target Date Mutual Funds in the Plan, Costing Plan Participants Significantly More in Fees for an Identical Product.**

80.     Plan fiduciaries must be continually mindful of the types of investment options available to ensure they do not unduly risk plan participants' savings or charge unreasonable fees.

81.     For example, the Defendants should have realized that the T. Rowe Price target date mutual funds were directing a substantial portion of their assets into the proprietary T. Rowe Price Equity Index 500 fund, which charged a fee that Morningstar called "outrageous":

Target-date managers can better serve investors by using cheap options when selecting underlying index funds. There are over 40 large-cap passive options used within target-

18

> date funds, ranging from large-value to equally weighted indexes, but most reside in the large-blend Morningstar Category and track the S&P 500. Despite near identical objectives, prices vary. Fees range from cheap—Schwab and State Street both charged 0.03% on their U.S. large-cap index offerings—to simply outrageous—MainStay offers its MainStay S&P 500 Index for 0.35% and T. Rowe Price charges 0.25% for T. Rowe Price Equity Index 500, which has $27 billion in assets.

Morningstar 2017 Target-Date Fund Landscape Report (Apr. 21, 2017).

82.    During the Class Period, the Plan Defendants did not utilize the Plan's assets to substantially reduce fees by moving assets from mutual funds to lower-cost institutional vehicles, like institutional shares of mutual funds, collective investment funds or separate accounts, that provided an identical product.

83.    Like mutual funds, collective investment trusts ("collective trusts") pool plan participants' investments, but can provide an even lower fee alternative compared to institutional share classes of mutual funds.

84.    Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds, and cash, and are not available to the general public.

85.    Collective trusts are subject to regulation and oversight by the government, similar to mutual funds.

86.    Regulated by the Office of the Comptroller of the Currency, rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements and cannot advertise or issue formal prospectuses.

87.    Unlike with mutual funds, many collective trust managers are fiduciaries and are subject to ERISA fiduciary standards, *i.e.*, they must manage the collective trusts solely in the plan participants' interest, which is a benefit to plan participants who invest in collective trusts.

88.    Collective trusts are also subject to state and federal banking regulations that provide comparable protections to the Investment Company Act.

19

89.     To state it another way, collective trusts are subject to robust regulations, but do not have to be registered with the Securities and Exchange Commission because, unlike mutual funds, they are not a retail product available to the general public.

90.     Collective trusts thus can have much lower costs than mutual funds, with less or no administrative costs and less or no marketing or advertising costs.

91.     In fact, based on year-end 2019 data, Morningstar concluded that "When comparing the net expense ratio of collective trust tiers and mutual fund share classes of the same strategy, collective trusts are cheaper 91% of the time, and even considering only the least-expensive collective trusts tier and mutual fund share class, collective trusts are cheaper 82% of the time."[12]

92.     Retirement plans have used alternatives to mutual funds, such as collective trusts, for decades.

93.     "Mega Plans" of over $500 million have 45% of their assets in collective trusts.[13]

94.     Collective trusts contract directly with 401(k) plans and provide regular reports regarding costs and investment holdings.

95.     Collective trusts use a unitized structure, and the units are valued daily.

96.     As a result, participants invested in collective trusts can track the daily performance of their investments online.

97.     Since at least 2012, the Plan utilized a collective trust—the Mellon Stable Value Fund—as an investment option.

98.     Since at least 2016, the Inherited Plan utilized a collective trust as an investment option.

---

[12] MORNINGSTAR CENTER FOR RETIREMENT &POLICY STUDIES, RETIREMENT PLAN LANDSCAPE REPORT 25 (Mar. 2022).
[13] *Id.* at 26.

20

99.     On December 6, 2019, the Committee began to exclusively use collective investment trusts (with the exception of the money market and the brokerage) for the Inherited Plan, resulting in over 97% of plan assets ($525,720,887 out of $539,414,618) being transferred to collective investment trusts.[14]

100.    As noted earlier, the Committee was the plan administrator for both the Plan and the Inherited Plan.

101.    Defendants thus did not have concerns about the regulatory and transparency features of collective trusts.

102.    Many if not most mutual fund strategies are available in collective trust format, and in such instances the investments in the collective trusts are identical to those held by the mutual fund.

103.    "[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016).

104.    The T. Rowe Price Retirement Trusts collective trust is substantially identical—other than their lower cost—to the mutual fund-based T. Rowe Price Retirement Funds target-date series.

105.    The T. Rowe Price Retirement Trusts collective trust has the same portfolio management team, glidepath, subasset-class exposure, tactical allocation overlay and underlying investments as the mutual fund-based T. Rowe Price Retirement Funds target-date series.

---

[14] 2019 Tenneco Plan Form 5500, at 50.

106.     At all times during the Class Period, had Defendants utilized a prudent process and been properly discharging their duties for the exclusive benefit of the participants and allowing the participants to be charged only reasonable fees, Defendants would have known or should have known of the existence of the same target date investment in the lower-cost collective trust offering and should therefore have promptly identified the prudence of transferring the Plan's funds into these lower cost alternative investments.

107.     Despite the clear cost advantages of the collective trusts listed below, the Plan Defendants' failed to switch to the lower cost collective trust version of the same investment for the Plan.

108.     As the Eighth Circuit recently found in *Davis v. Washington University in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020), a fiduciary's failure to switch (or timely switch) to cheaper identical funds raises "plausible" "inferences of mismanagement" that the fiduciary either "failed to negotiate aggressively enough" or was simply "asleep at the wheel":

> The complaint alleges that the marketplace for retirement plans is competitive, and with $3.8 billion invested, WashU's "pool of assets" is large. From these facts, two inferences of mismanagement are plausible from WashU's failure to offer more institutional shares. The first is that it failed to gain access to them because, as the complaint alleges, it did not negotiate aggressively enough with Vanguard. The second is that it was asleep at the wheel: it failed to pay close enough attention to available lower-cost alternatives. Either way, a "failure of effort [or] competence" is enough to state a claim for breach of the duty of prudence.

960 F.3d 478, 483 (8th Cir. 2020)

109.     Likewise here, because the marketplace for retirement plans is competitive and the Plan's pool of assets is large, it is plausible and indeed reasonable to infer that Defendants were "asleep at the wheel" or "did not negotiate aggressively enough" and are guilty of a "failure of effort or competence" and failure to act with the "immediacy" that ERISA requires. *Davis*, 96-F.3d at 483.

110.    In simple terms, Defendants failed to timely switch to an investment option that was the same investment in a different wrapper at a much lower price, and this failure reveals that Defendants did not prudently monitor the Plan's investment options and make decisions in the best interest of Plan participants.

111.    Since at least 2016, the beginning of the Class Period, the Defendants could have offered the collective trust versions of the T. Rowe Price target date mutual funds in the Plan.

112.    The T. Rowe Price collective trust target date funds were as much as 65% less expensive than the identical mutual fund versions utilized by the Plan.[15]

113.    Other fiduciaries of large plans were prudently paying attention and using their scale to drive down costs in this way.

114.    For example, Garmin moved from T. Rowe Price mutual funds to T. Rowe Price collective investment trusts as early as 2014.

115.    The Plan, with hundreds of millions of dollars in various investment options, easily qualified for these lower cost options.

116.    At all times during the Class Period, the Plan had enough assets in the T. Rowe Price target date mutual funds needed to qualify for the lower-cost collective trust target date fund.

117.    The following chart provides an example of how much more expensive the Plan's T. Rowe Price target date mutual funds were than their identical collective trust counterparts in 2020:

| T Rowe Price Target Date Fund in Plan | Expense Ratio | T. Rowe Price Lower Cost Institutional Class/Collective Trust | Expense Ratio | % Fee Excess |
|---|---|---|---|---|

---

[15] The Defendants also failed to move to the less expensive institutional share classes of the T. Rowe Price target date mutual funds, instead choosing to keep the much more costly investor share classes. Other than the costs associated with each share class, these classes are identical.

| T. Rowe Price Retirement 2010 | 0.52% | T. Rowe Price Retirement 2010 Tr-F | 0.43% | 21% |
| T. Rowe Price Retirement 2015 | 0.55% | T. Rowe Price Retirement 2015 Tr-F | 0.43% | 28% |
| T. Rowe Price Retirement 2020 | 0.57% | T. Rowe Price Retirement 2020 Tr-F | 0.43% | 33% |
| T. Rowe Price Retirement 2025 | 0.61% | T. Rowe Price Retirement 2025 Tr-F | 0.43% | 42% |
| T. Rowe Price Retirement 2030 | 0.64% | T. Rowe Price Retirement 2030 Tr-F | 0.43% | 49% |
| T. Rowe Price Retirement 2035 | 0.67% | T. Rowe Price Retirement 2035 Tr-F | 0.43% | 56% |
| T. Rowe Price Retirement 2040 | 0.69% | T. Rowe Price Retirement 2040 Tr-F | 0.43% | 60% |
| T. Rowe Price Retirement 2045 | 0.71% | T. Rowe Price Retirement 2045 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement 2050 | 0.71% | T. Rowe Price Retirement 2050 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement Balanced | 0.50% | T. Rowe Price Retirement Balanced Tr-F | 0.43% | 16% |

118.    The following chart provides an example of how much more expensive the Plan's

T. Rowe Price target date funds were than their identical collective trust counterparts in 2019:

| T Rowe Price Target Date Fund in Plan | Expense Ratio | T. Rowe Price Lower Cost Institutional Class/Collective Trust | Expense Ratio | % Fee Excess |
| --- | --- | --- | --- | --- |
| T. Rowe Price Retirement 2010 | 0.53% | T. Rowe Price Retirement 2010 Tr-F | 0.43% | 23% |
| T. Rowe Price Retirement 2015 | 0.56% | T. Rowe Price Retirement 2015 Tr-F | 0.43% | 30% |
| T. Rowe Price Retirement 2020 | 0.59% | T. Rowe Price Retirement 2020 Tr-F | 0.43% | 37% |
| T. Rowe Price Retirement 2025 | 0.63% | T. Rowe Price Retirement 2025 Tr-F | 0.43% | 47% |
| T. Rowe Price Retirement 2030 | 0.66% | T. Rowe Price Retirement 2030 Tr-F | 0.43% | 53% |
| T. Rowe Price Retirement 2035 | 0.68% | T. Rowe Price Retirement 2035 Tr-F | 0.43% | 58% |
| T. Rowe Price Retirement 2040 | 0.70% | T. Rowe Price Retirement 2040 Tr-F | 0.43% | 63% |
| T. Rowe Price Retirement 2045 | 0.71% | T. Rowe Price Retirement 2045 Tr-F | 0.43% | 65% |

| T. Rowe Price Retirement 2050 | 0.71% | T. Rowe Price Retirement 2050 Tr-F | 0.43% | 65% |
|---|---|---|---|---|
| T. Rowe Price Retirement Balanced | 0.51% | T. Rowe Price Retirement Balanced Tr-F | 0.43% | 19% |

119.    A prudent fiduciary conducting a prudent, impartial review of the Plan's investments would have identified the collective trust option and transferred the Plan's investments into the above-referenced fund collective trusts at the earliest opportunity.[16]

120.    The Plan Defendants failed to take such action, acting imprudently with respect to the Plan.

121.    Inexplicably, while failing to take action to lower costs for participants in the Plan, the Committee (which was plan administrator for both the Plan and the Inherited Plan by this time) did replace the T. Rowe Price target date mutual funds with their lower cost collective trust counterparts for the Inherited Plan in 2019.

122.    On December 6, 2019, Inherited Plan discontinued using the T. Rowe Price target date mutual funds and began using the corresponding T. Rowe Price target date collective trust funds for the Inherited Plan.[17]

123.    Thus, the Committee's own actions in the Inherited Plan clearly show that they recognized that T. Rowe Price target date collective trust funds were lower cost versions of the T. Rowe Price mutual fund target date fund (with the same portfolio management team, glidepath, subasset-class exposure, tactical allocation overlay, and underlying investments) and that utilizing the T. Rowe Price target date collective trusts to lower costs was a prudent action.

---

[16] Moreover, not only did Defendants fail to utilize the collective trust version of these funds, they inexplicably offered the investor share classes, rather than the cheaper institutional share classes, of these T. Rowe Price target date mutual funds.

[17] 2019 Tenneco Plan Form 5500, at 47 and Item 1, Schedule H, Part I, Column B.

124. Despite this change in the Inherited Plan in 2019, Defendants still failed to switch to the T. Rowe Price target date collective trust series in the Plan.

125. As a result, the Plan continued to incur excess investment fees due to Defendants' failure to adequately investigate the availability of collective trusts or separate accounts of the same investment in the Plan and their failure to switch to the T. Rowe Price collective trust series though they clearly found it to be a prudent decision for the Inherited Plan in 2019.

126. Even though a prudent fiduciary would have switched from the higher cost T. Rowe Price target date mutual funds to the lower cost (but otherwise equivalent) collective investment trust version by 2016, and even though the Defendants themselves actually made this change in the Inherited Plan in 2019, the Defendants inexplicably continue to use the higher cost mutual fund version in the Plan as of April 25, 2022.

127. Because of the Plan's size, it could have reaped considerable cost savings by using collective trusts or separate accounts.

128. Failing to incorporate (or timely incorporate) the T. Rowe Price collective trust options in the Plan shows that Defendants did not employ (or timely employ) a prudent, loyal process to select, monitor, remove, and retain investment options.

129. Defendants' failure to monitor (or timely monitor) investment options and identify and implement (or timely identify and implement) the lowest cost alternatives during the Class Period for the Plan violated ERISA and cost the Plan and its participants millions of dollars.

### *Defendants unreasonably failed to leverage economies of scale to negotiate for lower cost investments.*

130. Had the Defendants acted solely for the participants and beneficiaries for the exclusive purpose of providing benefits and defraying reasonable expenses of administering the plan, and like a prudent fiduciary, the Defendants would have leveraged the combined assets of

26

the Plan and the Inherited Plan to lower investment fees even more after Tenneco's acquisition of Federal-Mogul.

131.    Larger asset balances in 401(k) plans lead to economies of scale and special pricing within collective trusts, mutual funds, and other investment products.

132.    Larger 401(k) plans have significantly lower asset-weighted average expense ratios than smaller plans. Morningstar reports that, based on 2019 data, the median investment fee for a mega plan ($500 million or more) is 0.33%, 23% lower than the median investment fee for a small plan ($25 million or less).[18]

133.    The Plan's expense ratios were multiples of what they should have been given the bargaining power available to Defendants.

134.    For example, in a 2019 Pensions and Investments article regarding the increased usage of collective investment trusts, Joseph F. Martel, Vice President of T. Rowe Price Group, Inc., explained that collective trust pricing depends on various factors such as "total assets."[19]

135.    As another example, T. Rowe Price's brochure from 2020 entitled "The advantages of T. Rowe Price Collective Investment Trusts" notes, "Fees and investment minimums may be negotiable."[20] This brochure has a table showing that as investments in the T. Rowe Price Retirement Trusts increases, the fees dropped from 46 basis points at $20 million to 38 basis points at $1 billion (a 17% decrease in fees for the same target date investment strategy).[21]

136.    It is well known in the 401k consulting industry that a prudent fiduciary acts in the

---

[18] MORNINGSTAR CENTER FOR RETIREMENT &POLICY STUDIES, RETIREMENT PLAN LANDSCAPE REPORT 18, EX. 9 (Mar. 2022).

[19] Robert Steyer, *CIT target-date assets surging as mutual funds hit by outflows*, PENSIONS & INVESTMENTS (June 24, 2019), https://www.pionline.com/print/cit-target-date-assets-surging-mutual-funds-hit-outflows.

[20] T. Rowe Price, *The Advantages of T. Rowe Price Collective Investment Trusts*, at 3.

[21] *Id.* at 6–8.

best interest of the participants and beneficiaries to defray reasonable fees by leveraging additional assets.

137. FI360 is a nationally known company that provides fiduciary training and certifications, and is the publisher of Prudent Practices for Investment Stewards. An Investment Steward is a person who has the legal responsibility for managing investment decisions, including plan sponsors, trustees and investment committee members.[22]

138. As explained by FI360's Prudent Practices for Investment Stewards, Prudent Practice 4.4: "Fiduciaries have a duty to control and account for all dollars spent for investment management services . . . ."[23]

139. After Tenneco acquired Federal-Mogul, the Inherited Plan had T. Rowe Price Target Date Funds ("TDF") assets of $835 million, and the Plan had $380 million.

140. Altogether, the Plan and Inherited Plan had over $1 billion of assets in T. Rowe Price target date funds, which would have qualified the Plan (and the Inherited Plan) for even lower cost pricing on T. Rowe Price's target date collective investment trusts than than it was eligible for on its own had the Defendants acted solely for the participants and beneficiaries and for the exclusive purpose of defraying reasonable expenses of administering the Plan.

141. Failing to timely switch the Plan and the Inherited Plan to the T. Rowe Price collective trust options and to leverage the combined assets to negotiate lower cost T. Rowe Price collective trusts show that Defendants did not employ (or timely employ) a prudent, loyal process to select, monitor, remove, and retain investment options.

---

[22] *Prudent Practices*, FI360, https://www.fi360.com/resources/prudent-practices/ (last visited May 15, 2022).
[23] FI360, PRUDENT PRACTICES FOR INVESTMENT STEWARDS 97 (2020), https://www.fi360.com/uploads/media/handbook_stewards_2020.pdf.

142. Defendants' failure to monitor (or timely monitor) investment options and identify and implement (or timely identify and implement) the lowest cost alternatives during the Class Period for the Plan violated ERISA and cost the Plan and its participants hundreds of thousands of dollars.

### *Defendants failed to appropriately monitor the investments and switch to substantially similar, less costly funds that were equally or better-performing.*

143. Defendants retained at least five funds in the Plan which were more expensive, and in most cases considerably more expensive, than substantially similar alternative investment options that were available to the Plan.

144. These funds and examples of substantially similar lower-cost alternative investment options are shown in the following chart, along with their applicable expense ratios (using, as an example, expense ratios as of March 31, 2022):

| In Plan/Similar Low Fee Alternatives | Investment Option | Ticker | Expense Ratio (as of March 31, 2022) | % In-Plan Fee Exceeds Alternative Low Fee |
|---|---|---|---|---|
| | | | | |
| In Plan | Mellon Stable Value M | | 0.41% | |
| Low Fee Alternative | T. Rowe Price Stable Value Common Tr-N | | 0.20% | 105% |
| | | | | |
| In Plan | American Funds AMCAP R6 | RAFGX | 0.34% | |
| Low Fee Alternative | Vanguard Growth Index Inst | VIGIX | 0.04% | 750% |
| Low Fee Alternative | TIAA-CREF Large-Cap Growth Index Inst | TILIX | 0.05% | 580% |
| Low Fee Alternative | Vanguard Mega Cap Growth Ind Inst | VMGAX | 0.06% | 467% |
| Low Fee Alternative | Vanguard Russell 1000 Growth Index I | VRGWX | 0.07% | 386% |
| | | | | |
| In Plan | Goldman Sachs Gov Income Inst | GSOIX | 0.54% | |

| Low Fee Alternative | American Century Gov Bond R5 | ABTIX | 0.27% | 100.0% |
|---|---|---|---|---|
| Low Fee Alternative | Federated Total Return Gov Bond Inst | FTRGX | 0.33% | 63.6% |
| Low Fee Alternative | Fidelity Government Income | FGOVX | 0.45% | 20% |
| | | | | |
| In Plan | Lazard Emerging Markets Equity Inst | LZEMX | 1.11% | |
| Low Fee Alternative | Schwab Fundamental EM Large Co | SFENX | 0.39% | 184.6% |
| | | | | |
| In Plan | Fidelity Gov Money Market | SPAXX | 0.42% | |
| Low Fee Alternative | Vanguard Treasury Money Market | VUSXX | 0.09% | 366.7% |
| Low Fee Alternative | Vanguard Federal Money Market | VMFXX | 0.11% | 281.8% |

145.   The low fee investment option alternatives listed in the chart above performed comparably with or better than, and in some cases significantly better than, their comparable option in the Plan.

146.   The expense ratios for the in-plan and substantially similar alternative investment options in the other years of the Class Period were similar to the expense ratios identified above as of March 31, 2022 (which are provided simply as a specific illustration).

147.   The substantially similar, but lower-cost, alternative investment options in the chart above were identified using an industry recognized software program that uses quantitative methods, such as returns-based and holdings-based correlation analysis, to find funds that are highly similar to the fund being analyzed, resulting in an "apples-to-apples" comparison

148.   A prudent and loyal fiduciary would not have selected investment options that were significantly more expense, but performed no better (or significantly worse), than substantially similar alternative investment options. No reasonable, prudent justification exists for the Defendants' failure to do so.

*Defendants failed remove the more expensive single asset class actively managed investments and utilize far less costly single asset class index fund investments*

149. The Plan had between 14 and 16 single asset class investment ("single asset class investments") options from 2019 through April 25, 2022.

150. While approximately three of the single asset class investments were index funds, the vast majority were actively managed.

151. Index funds are a type of mutual fund or exchange-traded fund that tracks the returns of a particular market index. Market indexes measure the performance of a "basket" of securities, like stocks or bonds. This "basket" of securities is supposed to represent a sector of an economy or stock market. A person may not invest directly in a market index, but they may invest indirectly through an index fund which tracks a market index.

152. Generally, index funds are a passive style of investing, aiming to maximize returns over a long period of time by not buying and selling securities very often.

153. By contrast, actively managed funds are handled by individuals who are actively picking securities and determining when to sell, leading to more frequent purchases and sales with the ultimate goal of outperforming the market.

154. Typically, index funds have lower costs because, unlike actively managed funds, index fund managers are not actively picking securities and do not need supportive services like research analysts to help pick securities.

155. On or around December 6, 2019, the Defendants removed the following more expensive actively managed single asset class investments from the Inherited Plan's menu: the T. Rowe Price Blue Chip Growth Fund, the American Funds EuroPacific Growth Fund (also in the Plan), the Diamond Hill Small-Mid Cap Fund, the Lord Abbett High Yield Fund, the PIMCO Total Return Fund, the Vanguard Equity-Income Fund and the Vanguard Mid-Cap Growth Fund.

31

156.    There is also no debate that the same Defendants left in the Plan the more expensive actively managed single asset class investments from 2019 through at least April 25, 2022, including funds such as the American Funds EuroPacific Growth Fund that were removed from the Inherited Plan.

157.    While there is no exact way to know from publicly available information what changes participants made after the change to the Inherited Plan's line-up and how that would have affected asset-weighted expenses, a comparison of average expense ratios for the investment options in the Plan compared to the average expense ratios for the investment options in the Inherited Plan shows that the Defendants retained a much costlier line-up, on average in the Plan:

|  | 2020 Estimated Average Expenses (equally weighted) | 2019 Estimated Average Expenses (equally weighted) |
|---|---|---|
| Plan | 0.50% | 0.50% |
| Inherited Plan | 0.29% | 0.29% |
|  |  |  |
| Difference | 0.21% | 0.21% |
| % More Expensive | 42% | 42% |

158.    Based on the publicly available information, on average, the investments in the Plan were 42% more expensive than the investments in the Inherited Plan at the end of 2019 and 2020.

159.    Due to the imprudence of the Plan Defendants', Plaintiffs estimate that participants in the Plan could have paid over $1.6 million in additional unnecessary investment management fees in 2019 and over $1.8 million in additional unnecessary investment management fees in 2020. Estimates for years after 2020 require information that is not currently publicly available, but since the Defendants have not removed the more expensive actively managed single asset class investments from the Plan menu as of April 25, 2022, Plaintiffs expect that the additional

32

unnecessary investment management fees could be well over $2 million.

160.    Defendants' failure to make a similar change to the Plan cost participants millions in additional fees that participants in the Inherited Plan did not have to pay.

### *Defendants Allowed the Plan to Pay Unreasonable Fees for Recordkeeping.*

161.    Another clear indication of Defendants' imprudent fee monitoring process was the excessive recordkeeping and administrative fees the Plans' participants were required to pay during the Class Period.

162.    In the U.S. Supreme Court's recent *Hughes* decision involving allegedly imprudent recordkeeping fees, the Supreme Court determined that the Seventh Circuit Court of Appeals erred in relying on participant choice to excuse an allegedly imprudent decision by plan fiduciaries. *Hughes v. Northwestern University*, 595 U.S. ___, 142 S. Ct. 737, 741–42 (2022).

163.    The Supreme Court  acknowledged that an inquiry into an allegedly imprudent decision  will be "context specific" and, because of difficult tradeoffs, courts must give due regard to reasonable judgements made by the fiduciary, but held that plaintiffs need only plausibly allege a "violation of the duty of prudence as articulated in *Tibble*, applying the pleading standard discussed in *Ashcroft v. Iqbal*, 556 U. S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U. S. 544 (2007)." *Hughes*, 142 S. Ct. at 742.

164.    The duty of prudence in ERISA articulated in *Tibble* is that a fiduciary has a continuing duty (as opposed to a one-time duty) to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 575 U.S. 523, 530, 135 S. Ct. 1823 (2015). Applying the *Tibble* standard for the duty of prudence  to recordkeeping fees, Defendants were required to  monitor recordkeeping fees and, if imprudent, make appropriate changes.

33

165.    Defendants failed to satisfy the *Tibble* standard for the duty of prudence, as required by *Hughes,* by allowing the recordkeeper to charge excessive recordkeeping fees to the Plan.

166.    "Recordkeeping" refers to administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping is synonymous with administrative services fees, and these terms are used interchangeably herein.

167.    All national recordkeepers for large plans with substantial bargaining power (like the Plan and the Inherited Plan) offer two categories of recordkeeping services: bundled services and individual services.

168.    First, national recordkeepers offer large plans an overall suite of recordkeeping services as part of a "bundled" fee for a buffet of services on an "all-you-can-eat" basis, including, but not limited to, the following services: recordkeeping, transaction processing,  participant communications, plan document services, plan consulting services, accounting and audit services (e.g. Form 5500 preparation), compliance support, trust services, custody, and compliance testing.to ensure a plan remains qualified under the IRS rules.

169.    These "bundled" services are offered by all recordkeepers for one price (e.g.a pro rata or per capita price), regardless of the services chosen or utilized by the plan. The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

170.    Second, national recordkeepers offer large plans individual services, such as loan processing, self-directed brokerage account maintenance (if offered by the plan) distribution services, and processing of qualified domestic relations orders, on an á la carte basis. These

individual services often have separate, additional fees based on the individual participants' conduct and usage of services.

171.    Individual services fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another participant cover the cost of, for example, taking a loan from their own plan account balance.

172.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan.

173.    The cost of providing recordkeeping services often depends on the number of participants in a plan. Plans with a large number of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

174.    Recordkeeping expenses can be paid directly from plan assets, indirectly by the plan's investments (in a practice known as revenue sharing), with a combination of both direct payment and revenue sharing, or in whole or in part by a plan sponsor.

175.    Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

176.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*). "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging

35

a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."[24]

177.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

178.    Further, as *Hughes* makes clear in its application of *Tibble* to recordkeeping fees, plan fiduciaries subject to ERISA must engage in on-going monitoring to make sure that plan recordkeeping fees are reasonable.

179.    While Plaintiffs are limited to only the publicly available information about the Plan, that evidence supports Plaintiffs' allegations that Defendants failed to prudently monitor recordkeeping fees.

180.    The chart[25] below shows that when the Plan was compared to a peer group comprised of plans in the same business category with over 5,000 participants (over 50 plans met

[24] Justin Pritchard, *Revenue Sharing and Invisible Fees,* CC COACHING & CONSULTING, http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited May 15, 2022).
[25] This chart includes publicly available information reported on the Plan's Form 5500s as analyzed by a third party benchmarking service. Administrative Expense per Participant is determined by dividing the total operating expenses paid by the plan by the total active participants in the plan at the end of the year. Dollar amounts for years 2016 through 2018 estimated from information provided by the third-party benchmarking service.

that criteria), the Plan participants routinely paid significantly higher administrative fees than participants in comparable plans:

| Year | Plan Administrative Expense/Participant Percentile Rank | Peer Group Median Per Participant Admin Fee | Plan Per Participant Administrative Fee | % Plan's fee is higher |
|---|---|---|---|---|
| 2016 | Bottom 25% | $ 50.00 | $ 120.00 | 140% |
| 2017 | Bottom 25% | $ 65.00 | $ 140.00 | 115% |
| 2018 | Bottom 25% | $ 65.00 | $ 120.00 | 85% |
| 2019 | Bottom 25% | $ 58.00 | $ 81.00 | 40% |
| 2020 | Bottom 50% | $ 63.00 | $ 69.00 | 10% |
| 2021 | Information not publicly available | | | |
| 2022 | Information not publicly available | | | |

181.    Additional analysis based on the limited publicly available information shows that when the Plan's administrative fees are stacked up against the plans surveyed by NEPC[26], Plan participants were being charged higher fees overall than other plans of similar size, and, in some years, well over double what participants of similar-sized plans were paying:

| Year | Plan Participants as of Year End | Plan Per Participant Administrative Fee | Per Participant - Recordkeeper Trust and Custody Median Fee (or Range) for plans in 10,000 to 15,000 participants |
|---|---|---|---|
| 2016 | 10,292 | $120.00 | $53.00 |
| 2017 | 10,491 | $140.00 | $53.00 |
| 2018 | 10,498 | $120.00 | Not available |
| 2019 | 15,333 | $81.00 | $35 to $80 |
| 2020 | 10,085 | $69.00 | $35 to $70 |
| 2021 | INFORMATION | NOT | AVAILABLE |

---

[26] NEPC, LLC is one of the industry's largest independent, full-service investment consulting firms, serving more than 400 clients with over $1.3T assets under advisement. NEPC, LLC, Overview, LINKEDIN https://www.linkedin.com/company/nepc (last visited May 15, 2022). NEPC has conducted an annual survey of defined contribution plans for over 15 years.

| 2022 | INFORMATION | NOT | AVAILABLE |

182.    Because the Plan paid yearly amounts in recordkeeping fees that were generally well above industry standards during the Class Period and have continued to use the same recordkeeper since at least 2014 with no indication of negotiation or bidding, there is little to suggest that Defendants appropriately monitored the recordkeeping marketplace to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers.

183.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

184.    The devastating effect of unchecked recordkeeping and administration fees is seen clearly here and likely cost Plan participants millions of dollars in unnecessary and excess administration fees.

185.    In addition to negotiating better recordkeeping fees based solely upon the number of Plan participants, the Committee was in the unique position of also being the plan administrator for the Inherited Plan, another "Mega" plan with thousands more participants.

186.    Because of this, the Defendants, had they been acting for the exclusive benefit of the participants and beneficiaries to defray reasonable expenses and as a prudent fiduciary, could have utilized the total number of participants in both plans to negotiate even better recordkeeping pricing for the Plan (as well as for the Inherited Plan) by utilizing a single recordkeeper for both plans.

187.    However, since the Plan and Inherited Plan had different recordkeepers, and failed to pursue this prudent action.

188.    Had the Defendants properly discharged their fiduciary duties in accordance with ERISA, they would have continually monitored recordkeeping fees and negotiated reductions that were in line with the market. The Defendants' failure to do so resulted in damages to the Plan and a reduction in retirement benefits for Plan participants.

## CLASS ACTION ALLEGATIONS

189.    In addition to bringing this action on behalf of the Plan, pursuant to ERISA, Plaintiffs also bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all participants in and beneficiaries of the Plan during the six-year period preceding the filing of this Complaint through the present, with the exception of Defendants, Defendants' beneficiaries, and Defendants' immediate families (the "Class").

190.    Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

191.    The Class satisfies the numerosity requirement because they are composed of thousands of persons, in numerous locations.

192.    The Plan had thousands of participants and beneficiaries in every year of the Class Period, all of whom suffered from the limited, imprudent investment options and excessive and improper fees alleged herein.

193.    The number of class members is so large that joinder of all its members is impracticable.

194.    There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.

195.    Common legal and factual questions include, but are not limited to:

39

(a) Whether Defendants were fiduciaries responsible for monitoring and making decisions with respect to the investments in the Plan and services for the Plan;

(b) Whether the investment decisions made by Defendants were prudent;

(c) Whether the investment decisions made by Defendants were solely in the interests of the Plan's participants and beneficiaries;

(d) Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

(e) Whether the Plan suffered losses as a result of Defendants' fiduciary breaches; and

(f) Whether Defendants' acts proximately caused losses to the Plan and, if so, the appropriate relief to which Plaintiffs, on behalf of the Plan and the Class, are entitled.

196. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and the claims of all Class members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

197. Plaintiffs will fairly and adequately represent the Class and has retained counsel competent in the prosecution of ERISA class action litigation.

198. Plaintiffs have no interests antagonistic to those of other members of the Class.

199. Plaintiffs are committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

200. Plaintiffs have standing to bring this action on behalf of the Plan because they are participants in the Plan and were injured by Defendants' unlawful conduct.

40

201. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently or as of the time the account was distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

202. Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

203. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

204. In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

205. In the alternative, certification under Rule 23(b)(3) is appropriate because question of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted Against the Committee)**

41

206. Plaintiffs repeat and reallege each of their allegations set forth above as if fully set forth herein.

207. At all relevant times, Defendants Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

208. As explained above, as the fiduciaries in charge of a "mega" retirement plan, these Defendants breached their fiduciary duties to the Plan and their participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

209. As detailed above, the Prudence Defendants had fiduciary responsibilities with respect to selecting, monitoring, and removing investment options in the Plan and minimizing recordkeeping fees.

210. As detailed above, the Prudence Defendants caused the Plan to invest millions of dollars in investment options that were not in keeping with their fiduciary responsibilities, failed to leverage the size of the Plan to minimize costs, failed to monitor and minimize the Plan's recordkeeping costs and failed to utilize the additional leverage available to them by virtue of their unique position as a fiduciary of both the Plan and the Inherited Plan.

211. By the conduct and omissions described above, the Prudence Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

212. By the conduct and omissions described above, the Prudence Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

213. Each Prudence Defendant knowingly participated in each violation by the other Prudence Defendants, knowing that such acts were a violation, enabled the other Prudence Defendants to commit violations by failing to lawfully discharge such Prudence Defendant's own duties, and knew of the violations by the other Prudence Defendants and failed to make any reasonable and timely effort under the circumstances to remedy those violations.

214. Accordingly, each Prudence Defendant is also liable for the violations by its co-fiduciaries under 29 U.S.C. § 1105(a). As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid substantial excess investment management, recordkeeping, and other related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which the Prudence Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109 and 29 U.S.C. § 1132(a)(2).

215. The Plan and its participants suffered millions of dollars of losses due to these excessive costs and lower net investment returns.

216. If the Prudence Defendants had complied with their fiduciary obligations, then the Plan would not have suffered these losses, and Plan participants would have more money available to them for their retirement.

43

217.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

218.    In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for the Prudence Defendants' breaches as set forth in their Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted Against Tenneco Inc., DRiV, and TAOC)

219.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

220.    Upon information and belief, Tenneco Inc. had authority to appoint the individual members of the Committee. On 2020 Form 5500 filings, the Committee is identified as a plan administrator for at least five different employee benefit plans sponsored by TAOC and DRiV, both of which are subsidiaries of Tenneco Inc.[27]

221.    In light of this authority, Tenneco Inc. had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan by replacing individual members of the Committee in the event that they were not fulfilling those obligations.

222.    Upon information and belief, DRiV and TAOC, as plan sponsors for the Plan during the Class Period, appointed the Committee as plan administrator of the Plan. Accordingly, DRiV

---

[27] *See* DRiV 2020 Form 5500, at 1-2; Tenneco 401(k) Investment Plan 2020 Form 5500, at 1–2; December 31, 2020 Form 5500 of the Tenneco 401(k) Master Trust filed with the United States Department of Labor, at 1–2; December 31, 2020 Form 5500 of the Tenneco Welfare Benefit Plan filed with the United States Department of Labor, at 1–2; December 31, 2020 Form 5500 of the Tenneco Employee Investment Plan filed with the United States Department of Labor, at 1–2.

and TAOC had the authority and obligation to monitor the Committee, and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

223. In light of this authority, DRiV and TAOC had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the even that the Committee was not fulfilling those duties.

224. Tenneco Inc., DRiV, and TAOC had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to Tenneco Inc., DRiV, and TAOC.

225. These Defendants breached their fiduciary monitoring duties by, among other things:

> (a) Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

> (b) failing to monitor the processes by which the Plan's investments were evaluated; and

> (c) failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

226. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had Tenneco Inc., DRiV, and TAOC complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

227. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Tenneco Inc., DRiV, and TAOC are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

### PRAYER FOR RELIEF

228. WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

(a) A determination that Plaintiffs may proceed on behalf of the Plan, in accordance with ERISA;

(b) A determination that this action may proceed as a class action under Rule 23(b)(1) or, in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

(c) Designation of Plaintiff Ryan Frayer and Tanika Parker as class representatives for the Plan and designation of Plaintiffs' counsel as Class Counsel;

(d) A declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

(e) An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the plan's assets, and to restore

to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

(f) Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

(g) An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

(h) Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of the Plan's fiduciaries deemed to have breached their fiduciary duties;

(i) An award of pre-judgment interest;

(j) An award of costs pursuant to 29 U.S.C. § 1132(g);

(k) A service award to the class representatives;

(l) An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

(m) Such other and further relief as the Court deems equitable and just.

_E. B. Chiles_
_____
Emmett Bowers Chiles IV, #96179
**QUATTLEBAUM, GROOMS
& TULL PLLC**
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Phone: (501) 379-1734
Fax: (501) 379-1701
Email: cchiles@qgtlaw.com

**FOULSTON SIEFKIN LLP**
Boyd A. Byers, KS #16253
(*Pro Hac* Admission to be Requested)
Emily L. Matta, KS #28596
(*Pro Hac* Admission to be Requested)
1551 N. Waterfront Pkwy, Suite 100
Wichita, Kansas 67206-4466
Phone:  (316) 291-9716
Fax:      (316) 771-6011
Email: bbyers@foulston.com
ematta@foulston.com


Scott C. Nehrbass, KS #16285
(*Pro Hac* Admission to be Requested)
32 Corporate Woods, Suite 600
9225 Indian Creek Parkway
Overland Park, KS 66210-2000
Phone:  (913) 253-2144
Fax:    (913) 498-2101
Email: snehrbass@foulston.com

*Counsel for Plaintiffs and the
Putative Class*