**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 1 5 2022

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK


**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS, NORTHERN DIVISION**

| | |
|---|---|
| RYAN FRAYER, TANIKA PARKER, and ANDREW FARRIER, individually and on behalf of all others similar situated, the DRIV 401(K) RETIREMENT SAVINGS PLAN, and the TENNECO 401(K) INVESTMENT PLAN, <br><br> *Plaintiffs*, <br><br> v. <br><br> TENNECO INC.; DRIV AUTOMOTIVE INC.; TENNECO AUTOMOTIVE OPERATING COMPANY INC.; FEDERAL-MOGUL CORPORATION; FEDERAL-MOGUL LLC; FEDERAL-MOGUL POWERTRAIN LLC; THE TENNECO BENEFITS COMMITTEE; TENNECO BENEFITS & PENSION INVESTMENT COMMITTEE; and JOHN AND JANE DOE DEFENDANTS 1-30, <br><br> *Defendants*. | Case No. 3:22-cv-00132 <br><br> **AMENDED CLASS ACTION COMPLAINT** |

## INTRODUCTION

Plaintiffs Ryan Frayer, Tanika Parker, and Andrew Farrier, on behalf of the DRiV 401(k) Retirement Savings Plan (the "DRiV Plan") and the Tenneco 401(k) Investment Plan (the "Tenneco Plan") (collectively "the Plans"), themselves, and all others similarly situated, bring this class action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against the fiduciaries of the DRiV Plan and the Tenneco Plan, which include Tenneco Inc., DRiV Automotive Inc., Tenneco Automotive Operating Company Inc., Federal-Mogul Powertrain LLC, Federal-Mogul LLC, Federal-Mogul Corporation, the Tenneco Benefits Committee, the Tenneco Benefits & Pension Investment Committee, and John and Jane Does 1–30 (collectively "Defendants"), for breaches of their fiduciary duties. On July 1, 2022, after

1

Plaintiffs filed their Complaint in this case, the DRiV Plan was merged into and became a part of the Tenneco Plan.

Plaintiffs bring this action by and through their undersigned attorneys based upon personal knowledge, information contained in the Plans' publicly available Form 5500 series filings with the United States Department of Labor and Form 11-K filings with the United States Securities and Exchange Commission, the account information and statements provided to them as participants in the Plans, and other information publicly available or obtained through counsel's preliminary investigation. Plaintiffs anticipate that discovery will uncover further support for the allegations in the Amended Complaint, and, potentially, for additional claims.

As described herein, Defendants have breached their fiduciary duties to Plaintiffs, in violation of ERISA, to the detriment of the Plans and their participants and beneficiaries. Plaintiffs bring this action to remedy this unlawful conduct, prevent further mismanagement of the Plans, and obtain equitable and other relief as provided by ERISA. Plaintiffs bring this action and request this relief for the benefit of the Plans as well as their participants and beneficiaries.

In support of their claims, Plaintiffs state and allege as follows:

### NATURE OF THE CASE

1.      Plaintiffs bring this case on behalf of the Plans, themselves, and all persons who were and/or are participants in or beneficiaries of either or both of the Plans pursuant to the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.*

2.      Plaintiffs bring this case against the fiduciaries of the Plans, which include Tenneco Inc., DRiV Automotive Inc., Tenneco Automotive Operating Company Inc., Federal-Mogul Powertrain LLC, Federal-Mogul LLC, Federal-Mogul Corporation, the Tenneco Benefits

2

Committee, the Tenneco Benefits & Pension Investment Committee, and John and Jane Does 1–30 (collectively "Defendants"), for breaches of their fiduciary duties during the Class Period (defined as the six-year period preceding the filing of the original Complaint in this case through the date of judgment).

3. To protect plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(A)–(B). These fiduciary obligations of plan fiduciaries to the participants and beneficiaries of an ERISA-governed plan are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602 (8th Cir. 2009).

4. Employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." Emp. Benefits Sec. Admin., U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 2 (Sept. 2019) [hereinafter *A Look at 401(k) Plan Fees*], https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

5. Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of services to the plan and investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act § 7. Indeed, an employer has a specific obligation to consider the fees and expenses paid by [a] plan.

3

6.      "Cost-conscious management is fundamental to prudence in the investment function, and should be applied not only in making investments but also in monitoring and reviewing investments." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (internal quotations and citations omitted).

7.      Additional fees of only 0.18% or 0.4% can have a large impact on a participant's investment results over time because plan participants and beneficiaries "subject to higher fees . . . lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Id.*

8.      "[E]ven in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes v. Nw. Univ.*, 595 U.S. __, 142 S. Ct. 737, 738–39 (2022) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015)). And, if the fiduciaries "fail to remove an imprudent investment from the plan within a reasonable time," they breach their duty. *Id.*

9.      According to Morningstar, each of the Plans was a "Mega plan," with over $500 million in assets each, placing them within the top 0.2% of all 401(k) plans based on size.

10.     As large plans in the defined contribution plan marketplace, the Plans had substantial bargaining power regarding the fees, expenses, and costs that were charged against participants' investments.

11.     During the Class Period, Defendants, as fiduciaries of the Plans, breached the duties they owed to the Plans, to Plaintiffs, and to other Plan participants and beneficiaries by failing to adequately monitor and control the Plans' fees, expenses, and costs, allowing service providers to charge excessive fees, expenses, and costs.

4

12. Defendants' mismanagement of the Plans cost the Plans and their participants millions of dollars.

13. Plaintiffs bring this action to remedy the losses sustained as a result of Defendants' fiduciary breaches and to obtain such further equitable or remedial relief as may be appropriate to redress and to enforce the provisions of ERISA.

14. Plaintiffs assert claims against Defendants for breaching their fiduciary duties, as set forth below.

15. This Amended Complaint is based upon known facts and reasonable inferences drawn from the facts as set forth herein.

### THE PARTIES

**Plaintiffs**

16. Plaintiff Ryan Frayer resides in Paragould, Arkansas. He was employed by DRiV in Paragould and participated in the DRiV Plan during the Class Period. During the Class Period Frayer invested in at least 13 different investment options offered by the DRiV Plan, including many of the imprudent options identified below, and paid the recordkeeping costs, administrative costs, and managed account fees associated with the DRiV Plan.

17. Plaintiff Tanika Parker resides in Kennett, Missouri. She is employed by DRiV in Paragould. She participated in the DRiV Plan during the Class Period and currently participates in the Tenneco Plan, into which the DRiV Plan was merged on July 1, 2022. During the Class Period Parker invested in at least 16 different investment options offered by the DRiV Plan, including many of the imprudent options identified below, and paid the recordkeeping costs, administrative costs, and managed account fees associated with the Plans.

18.     Plaintiff Andrew Farrier resides in Canton, Michigan. He was employed by Tenneco Automotive Operating Company Inc., a subsidiary of Tenneco, Inc., in Michigan and participated in the Tenneco Plan during the Class Period. During the Class Period he invested in imprudent options offered by the Tenneco Plan that are the subject of this lawsuit, and he paid the recordkeeping costs, and administrative costs associated with the Tenneco Plan.

19.     Each of the Plaintiffs has standing to bring this action because each of them participated in one or more of the Plans and were personally injured in fact as a result of Defendants' breaches of their fiduciary duties as alleged in more detail below. Those injuries include but are not limited to monetary injury from the imprudent investment options offered to them by the Plans, which charged excessive management fees (compared to lower-priced share classes of some of the same funds, lower-priced collective trust versions of some of the same funds, and lower-priced alternative options that performed as good or better); excessive overall recordkeeping fees; excessive managed account service fees; and monetary injury from diminution of the value of their retirement assets due to these excessive fees.

**Defendants**

20.     Tenneco Inc. ("Tenneco") is a publicly traded Delaware corporation with its principal place of business in Lake Forest, Illinois. It describes itself as "one of the world's leading designers, manufacturers and marketers of automotive products for original equipment and aftermarket customers, with full year 2021 revenues of $18 billion and approximately 71,000 team members working at more than 260 sites worldwide." On information and belief, it has authority to and did appoint the individual members of the Tenneco Benefits Committee and the Tenneco Benefits & Pension Investment Committee.

21.     Tenneco acquired Federal-Mogul LLC in or about October 2018.

22. In February 2022, Tenneco Inc. announced it had entered into an agreement to be acquired by affiliates of Apollo Global Management, Inc. in an all-cash transaction with an enterprise valuation of approximately $7.1 billion.

23. DRiV Automotive Inc. ("DRiV") describes itself as a subsidiary and division of Tenneco. It is a Delaware corporation with its headquarters in Lake Forest, Illinois. It operates a manufacturing facility in Paragould, Arkansas, that employed and/or continues to employ Plaintiffs Frayer and Parker and numerous Class Members. It was the sponsor of the DRiV Plan until that plan was merged into the Tenneco Plan.

24. Tenneco Automotive Operating Company Inc. ("Tenneco Automotive") is a Delaware company and a subsidiary of Tenneco with its headquarters in Lake Forest, Illinois. It is the current sponsor of the Tenneco Plan.

25. The Tenneco Benefits Committee was the administrator of the DRiV Plan throughout the Class Period.[1]

26. The Tenneco Benefits & Pension Investment Committee was and presently is the administrator of the Tenneco Plan, as discussed further below.[2]

27. Defendants John and Jane Does 1–30 are the individuals who are or were members of the Tenneco Benefits Committee and/or the Tenneco Benefits & Pension Investment Committee, as well as the other officers, employees, contractors, entities, and/or agents of the

---

[1] Plaintiffs use the committee name listed as the administrator for the DRiV Plan in the Plan's Form 5500s. In the event the Form 5500s misstate the name of the committee that serves as its administrator, the name used in this Amended Complaint is intended and shall be deemed to refer to the DRiV Plan's administrative committee by whatever other name(s) it is or has been known, including but not limited to the Administrative Committee of Tenneco Inc..

[2] Plaintiffs use the committee name listed as the administrator for the Tenneco Plan in the Plan's Form 5500s. In the event the Form 5500s misstate the name of the committee that serves as its administrator, the name used in this Amended Complaint is intended and shall be deemed to refer to the Tenneco Plan's administrative committee by whatever name it is known.

corporate Defendants who were fiduciaries of either Plan during the Class Period or are or were responsible for administering either of the Plans at any time during the Class Period. This necessarily includes, but is not limited to, those persons who were fiduciaries of the Tenneco Plan during the time Federal-Mogul Corporation, Federal-Mogul LLC, and/or Federal-Mogul Powertrain LLC served as the plan administrator. As such, defendants John and Jane Does 1–30 are or were the individuals or part of the group that was delegated control over the management of the Plans and their assets, including selecting and regularly monitoring the Plans' investment options and the performance and costs of those options, comparing them to other better-performing or less-costly alternatives, choosing and overseeing the Plans' third-party administrator, custodian, trustee, recordkeeper, and other service providers, and monitoring the compensation and minimizing the costs of such third-party services.

28.     Federal-Mogul Corporation was a Delaware corporation with its headquarters located in Southfield, Michigan. Corporate documents filed with the government say it was merged out of existence when it became Federal-Mogul LLC. According to a Form 5500 filed with the government, it was the sponsor and administrator of the Tenneco Plan during part of the Class Period.

29.     Federal-Mogul LLC was a Michigan limited liability company with its headquarters located in Southfield, Michigan. Corporate documents filed with the government say it was acquired by Tenneco in or about October 2018. According to a Form 5500 filed with the government, it was the sponsor and administrator of the Tenneco Plan during part of the Class Period.

30.     Federal-Mogul Powertrain LLC was or is a subsidiary of Tenneco. It is a Michigan limited liability company with its headquarters located in Southfield, Michigan. According to a

Form 5500 filed with the government, it was the sponsor of the Tenneco Plan during part of the Class Period, and both the sponsor and administrator of the Tenneco Plan during part of the Class Period.

31. Through its acquisition of Federal-Mogul LLC, which served as the administrator of the Tenneco Plan during part of the Class Period, Tenneco is liable for Federal-Mogul LLC's, as well as Federal-Mogul Corporation's and Federal-Mogul Powertrain LLC's, breaches of the fiduciary duties they owed to the Tenneco Plan and its participants and beneficiaries.

32. In the alternative, Federal-Mogul Corporation, Federal-Mogul LLC, Federal-Mogul Powertrain LLC, their prior owners, and their officers and agents that were fiduciaries of the Tenneco Plan remain liable for any and all breaches of ERISA's fiduciary duties that occurred during the times they, respectively, were the sponsor and/or administrator of the Tenneco Plan.

33. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

34. ERISA treats as fiduciaries not only persons expressly named as fiduciaries under 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.

35. Defendants are, or during the Class Period were, fiduciaries of the Plans under ERISA.

36. Defendants are or were fiduciaries of the Plans because they were so named; they exercised authority or control respecting management or disposition of the Plans' assets; they exercised discretionary authority or discretionary control respecting management of the Plans; they had discretionary authority or discretionary responsibility in the administration of the Plans; and/or they acquired a fiduciary and thus its liability.

## THE PLANS

### The DRiV Plan

37.     The DRiV 401(K) Retirement Savings Plan ("DRiV Plan") is a defined contribution plan as defined by ERISA.

38.     Prior to January 1, 2020, the DRiV Plan was known as the Tenneco 401(k) Retirement Savings Plan.

39.     From the beginning of the Class Period through January 1, 2020, Tenneco Automotive was the sponsor of the DRiV Plan.

40.     From January 1, 2020 until at least July 1, 2022, when the DRiV Plan was merged into the Tenneco Plan, DRiV was the sponsor of the DRiV Plan.  During some or all of this time period, Tenneco also purported to be a sponsor of the DRiV Plan. As stated in the DRiV Plan's form 5500s filed with the U.S. Department of Labor, from the beginning of the Class Period through at least July 1, 2022, when the DRiV Plan was merged into the Tenneco Plan, the Tenneco Benefits Committee was the administrator of the DRiV Plan.

### The Tenneco Plan

41.     The Tenneco 401(K) Investment Plan ("Tenneco Plan") is a defined contribution plan as defined by ERISA.

42.     Since at least January 1, 2020, Tenneco Automotive has been the sponsor of the Tenneco Plan.

43.     Since at least January 1, 2019, the Tenneco Benefits & Pension Investment Committee has been the administrator of the Tenneco Plan.

10

44.     At times during the Class Period before 2020, the Tenneco Plan was known as the Federal-Mogul Corporation 401(k) Investment Plan and as the Federal-Mogul 401(k) Investment Plan.

45.     At times during the Class Period before 2020, Federal-Mogul Corporation, Federal-Mogul LLC, and Federal-Mogul Powertrain LLC, respectively, were the Tenneco Plan's sponsor.

46.     At times during the Class Period before 2020, Federal-Mogul Corporation, Federal-Mogul LLC, and Federal-Mogul Powertrain LLC, respectively, served as the administrator of the Tenneco Plan.

## JURISDICTION AND VENUE

47.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

48.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

49.     Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

50.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

11

**ERISA'S FIDUCIARY STANDARDS**

51.     To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty, prudence, diversification, and compliance with the plan document upon plan fiduciaries. 29 U.S.C. § 1104(a)(1).

52.     These fiduciary duties apply to Defendants because they are or were fiduciaries of the Plans during the Class Period.

53.     ERISA § 404(a)(1) imposes a "prudent person" standard of care on plan fiduciaries:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     for the exclusive purpose of:
>
> > (i)     providing benefits to participants and their beneficiaries; and
> > (ii)    defraying reasonable expenses of administering or ;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)     by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D)     in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV.

29 U.S.C.§ 1104(a)(1).

54.     ERISA also imposes co-fiduciary duties on plan fiduciaries under ERISA § 405, which states in relevant part that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

12

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105.

55.    Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments must act prudently and solely in the interest of participants and beneficiaries of the plan.

56.    Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings 401(k) Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

57.    Indeed, fiduciary decisions may dramatically affect the amount of money participants save for retirement.

58.    For example, an illustration from the Department of Labor shows that a 1% difference in fees over a person's career makes a 28% difference in retirement savings. *A Look at 401(k) Plan Fees* at 2.

59.    An ERISA fiduciary has a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).

60.    Prudence requires a review at "regular intervals." *Id.* at 529 (citations omitted).

61.    As the Department of Labor explains:

[T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the plan to forego other

> investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

62. As the Supreme Court recently explained, plan fiduciaries may not simply provide a menu of options, some of which are prudent, and rely "on the participants' ultimate choice" from that menu to excuse their imprudent decisions. *Hughes*, 142 S. Ct. at 741–42. "[E]ven in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.* at 738–39 (citing *Tibble*, 575 U.S. at 529–30). If, the Court explained, the fiduciaries "fail to remove an imprudent investment from the plan within a reasonable time," they breach their duty. *Id.*

63. In *Hughes* the Supreme Court applied *Tibble* to the pleading standard for a wide range of alleged plan deficiencies, including allegations that fiduciaries "failed to monitor the Plans' investments in a number of ways, including by retaining recordkeepers that charged excessive fees, offering options likely to confuse investors, and neglecting to provide cheaper and otherwise-identical alternative investments." *Hughes*, 142 S. Ct. at 741–42.

64. A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries, as the Department of Labor has explained:

> [T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and beneficiaries, as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. In other words, in deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate

an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988).

65.    In a separate publication, the Department of Labor further explains:

The Federal law governing private-sector plan, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing a plan – referred to as fiduciaries – carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.

. . . .

Plan fees and expenses are important considerations for all types of plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

. . . .

**Investment fees.** By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

Emp. Benefits Sec. Admin., U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses* 1–2 (Sept. 2021), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf.

15

## GENERAL ALLEGATIONS

### Background of the Plans

66.     The Plans are defined contribution plans within the meaning of ERISA.

67.     A "defined contribution" or "individual account" plan is a type of retirement plan in which an individual account is set up for each participant, and benefits are based on the amounts contributed to those accounts (through employee contributions and, if applicable, employer contributions), and any income, expenses, gains, and losses.

68.     Each participant directs plan contributions in his or her individual account into one or more investment alternatives in a lineup chosen by the plan's fiduciaries.

69.     Participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of the contributions, less expenses.

70.     Defendants selected and retained various investment options made available to participants in the Plans and chose the recordkeepers for the Plans.

71.     At the choice and discretion of Defendants, various investment options were made available to participants in the Plans.

72.     For example, as of December 31, 2020, the DRiV Plan included 27 investment options comprised of 24 mutual funds, one collective investment trust fund, a Tenneco Inc. common stock fund, and a self-directed brokerage account; whereas, as of the same date, the Tenneco Plan included 21 investment options comprised of 19 collective investment trust funds, a Tenneco Inc. common stock fund, and a self-directed brokerage account.

73.     The fiduciaries have exclusive control over this menu of investment alternatives available to plan participants.

16

74.     As the Plans' fiduciaries, Defendants must engage in a prudent and loyal process to select, monitor, remove, and retain the Plans' investment options.

75.     ERISA's duty of prudence is a continuing one; that is, a fiduciary has a continuing duty (as opposed to a one-time duty) to monitor plan investments and remove imprudent ones.

76.     As noted above, under 29 U.S.C. § 1104(a)(1), Defendants must provide diversified investment options for the Plans. But diversification is not the only consideration for a prudent and loyal fiduciary. ERISA also requires Defendants to evaluate and monitor the fees and costs associated with the Plans' investment options and to give substantial consideration to those fees and costs when determining which options to remove or retain.

77.     Each investment option has its own fees, typically expressed as a percentage of assets under management, or expense ratio. If, for example, a fund charges 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points. The fees deducted from an investment option reduce the value of the shares, and thus reduce the returns participants receive on their investments.

> These plan expenses can significantly reduce the value of an account in a defined-contribution plan.

78.     Thus, "a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble*, 843 F.3d at 1198.

79.     A fiduciary's failure to switch (or timely switch) to less expensive identical funds raises "plausible" "inferences of mismanagement" that the fiduciary either "failed to negotiate aggressively enough" or was simply "asleep at the wheel":

> The complaint alleges that the marketplace for retirement plans is competitive, and with $3.8 billion invested, WashU's "pool of assets" is

17

> large. From these facts, two inferences of mismanagement are plausible from WashU's failure to offer more institutional shares. The first is that it failed to gain access to them because, as the complaint alleges, it did not negotiate aggressively enough with Vanguard. The second is that it was asleep at the wheel: it failed to pay close enough attention to available lower-cost alternatives. Either way, a "failure of effort [or] competence" is enough to state a claim for breach of the duty of prudence.

*Davis v. Wash. Univ.*, 960 F.3d 478, 483 (8th Cir. 2020).

80.    The fees assessed to 401(k) plan participants are generally attributable to two types of services: plan recordkeeping and investment management.

81.    The Plans' fiduciaries have control over these expenses.

82.    The fiduciaries are responsible for hiring administrative service providers and negotiating and approving their compensation.

83.    As a result of the foregoing, these fiduciary decisions have the potential to dramatically affect the amount of money plan participants are able to save for retirement, and fiduciaries must engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees.

84.    A fiduciary's "duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule." Restatement (Third) of Trusts ch. 17 intro. note, Westlaw (database updated May 2022); *see also Tibble*, 575 U.S. at 529–30 (relying on Restatement (Third) of Trusts to interpret ERISA).

85.    This duty to engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees is particularly true for the Plans in this case because they are very large plans with the bargaining power and leverage to negotiate for, and obtain, the lowest fees.

86.     Plan fiduciaries must be continually mindful of the types of investment options available to large 401(k) plans to ensure they do not unduly risk plan participants' savings or charge unreasonable fees.

87.     As the Department of Labor explains: "Plans with more total assets may be able to lower fees by using special funds or classes of stock in funds, which generally are sold to larger group investors. 'Retail' or 'brand name' funds, which are also marketed to individual and small group investors, . . . typically charge higher fees." *A Look at 401(k) Plan Fees* at 8.

88.     Based on the most recent data available to Plaintiffs, even prior to the merger of the DRiV Plan into the Tenneco Plan on July 1, 2022, each of the Plans by itself had over $500 million in assets and was in the top 0.2% of all 401(k) plans in terms of both total plan assets and number of plan participants, making it a "Mega plan" according to Morningstar.

89.     Because of the size of the Plans, their fiduciaries had access investments options not generally available to smaller plan and significant bargaining power with respect to the fees and expenses that were charged against participants' investments and the fees and expenses charged for recordkeeping services.

90.     But, as described below, despite the size of the Plans, Defendants breached their fiduciary duties by failing to take (or timely take) advantage of this leverage and bargaining power, and failing to take (or timely take) appropriate actions to reduce the Plans' investment and recordkeeping expenses, or exercise appropriate judgment to scrutinize each investment option that was offered in the Plans during the Class Period to ensure it was prudent.

91.     Like plaintiffs in similar cases, Plaintiffs did not have, and do not have, actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, such as Defendants processes, and execution of such processes, for selecting, monitoring, reviewing,

19

and removing investment options, or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

92. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed, including, among other things, the investment options that are comparable to the investments offered within the Plans, comparisons of the costs and investment performance of the Plans' investments versus available alternatives within similarly sized plans, total cost comparisons to similarly sized plans, information regarding other available (and less expensive) share classes, information regarding the availability and pricing of collective trusts and separate accounts, and information about market-rate recordkeeping and managed-account service costs. Having never managed large 401(k) plans such as the Plans, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans. Plaintiffs did not and could not review the meeting minutes or other evidence of Defendants' fiduciary decision-making process, or the lack thereof.

**The fiduciaries of the DRiV Plan failed to administer the plan in a prudent manner.**

93. Based upon the most recent data available to Plaintiffs, the DRiV Plan had over $500 million in assets and was in the top 0.2% of all 401(k) plans based on plan assets throughout the Class Period. For example, as of December 31, 2019, the DRiV Plan had 15,333 participants, with $1,163,574,939 in total assets (approximately $691,044,411 of which were invested in mutual

20

funds), and as of December 31, 2020, the DRiV Plan had 10,085 participants, with $893,536,564 in total assets.

94. As described above, Defendants were fiduciaries of the DRiV Plan.

95. Based on alleged facts and the reasonable inferences regarding these facts, Defendants failed to administer the DRiV Plan in a prudent manner, in violation of their fiduciary duties.

96. For example, Defendants did not adhere to standard fiduciary best practices to control the DRiV Plan's costs when looking at certain aspects of the DRiV Plan's administration, such as monitoring investment management fees for the DRiV Plan's investments, resulting in many of the investment options during the Class Period being more expensive than comparable investment options found in similarly sized plans.

97. Retirement plan participants pay for the cost of the plan's investment options via each option's expense ratio, based on a percentage of assets. For example, an expense ratio of 0.77% means the participant will pay $7.70 annually for every $1,000 in assets. This expense ratio thus reduces the participant's return and the compounding effect of that return. Thus, prudent plan fiduciaries must consider the effect that expense ratios have on investment returns, as it is in the best interest of participants to do so.

98. Here, Defendants could not have engaged in a prudent process as it relates to the investment management fees, recordkeeping fees, and managed-account fees charged to participants in the DRiV Plan.

99. As explained below, Defendants failed to take advantage of savings offered by lower cost share classes of mutual funds already in the DRiV Plan; failed to take advantage of lower cost investment vehicles that were otherwise identical to those in the DRiV Plan, such as

21

collective trusts (also called "collective investment trusts" and "collective trust funds"); and failed to offer the DRiV Plan's participants alternative investment options (including some offered by the Tenneco Plan) that were less costly and equally or better-performing.

100.    As a result of Defendants' systemic failure to properly investigate and select lower cost investment options for the DRiV Plan's participants (as explained in detail below), a substantial portion of the menu of investment options was overpriced compared to the other options that prudent and loyal fiduciaries would have selected for the benefit of the DRiV Plan and its participants (*e.g.*, lower price share classes of the same funds; lower price, substantially similar alternative investments; and lower price collective trust versions of identical mutual funds).

101.    During the years in the Class Period, nearly half or more than half of the investment options offered by the DRiV Plan have been overpriced.

102.    Had Defendants fulfilled their duties under ERISA and engaged in a prudent process to select, monitor, retain, and remove investment options from the DRiV Plan, these failures would not have occurred.

103.    Defendants' actions were contrary to the actions of a reasonable fiduciary and cost the DRiV Plan and its participants millions of dollars in excessive fees.

**Defendants failed to replace the T. Rowe Price target date mutual funds offered by the DRiV Plan with substantively identical, but much less expensive, collective trust versions of these same funds.**

104.    Target-date funds ("TDFs") are a class of funds that periodically rebalance asset class weights to optimize risk and returns for a predetermined time frame. The asset allocation of a target-date fund is typically designed to gradually shift to a more conservative profile over time so as to minimize risk when the target date approaches. Target-date funds offer investors the

22

convenience of putting their investing activities on autopilot in one vehicle. Target-date funds usually mature in five-year intervals, such as 2035, 2040, and 2045.

105.   Throughout the Class Period, the DRiV Plan offered a series of T. Rowe Price target date mutual funds among its offerings to DRiV Plan participants.

106.   Throughout the Class Period, Defendants selected and retained the investor share class of the T. Rowe Price target date mutual funds.

107.   Throughout the Class Period, the DRiV Plan had enough assets to qualify for the much-cheaper collective trust version of these same target-date mutual funds.

108.   Like mutual funds, collective trusts pool plan participants' investments but can provide an even lower fee alternative than mutual funds.

109.   Collective trusts are administered by banks or trust companies—which assemble a mix of assets such as stocks, bonds, and cash—and are not available to the general public.

110.   Collective trusts contract directly with 401(k) plans and provide regular reports regarding costs and investment holdings.

111.   Collective trusts use a unitized structure, and the units are valued daily. Thus, participants invested in collective trusts can track the daily performance of their investments online.

112.   Collective trusts are subject to regulation and oversight by the government, similar to mutual funds.

113.   Regulated by the Office of the Comptroller of the Currency, rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements and cannot advertise or issue formal prospectuses.

114.    Unlike with mutual funds, many collective trust managers are fiduciaries and are subject to ERISA fiduciary standards, *i.e.*, they must manage the collective trusts solely in the plan participants' interest, which is a benefit to plan participants who invest in collective trusts.

115.    Collective trusts are also subject to state and federal banking regulations that provide comparable protections to the Investment Company Act.

116.    To state it another way, collective trusts are subject to robust regulations, but do not have to be registered with the Securities and Exchange Commission because, unlike mutual funds, they are not a retail product available to the general public.

117.    Collective trusts thus can have much lower costs than mutual funds, with less or no administrative costs and less or no marketing or advertising costs.

118.    Retirement plans have used alternatives to mutual funds, such as collective trusts, for decades.

119.    Other fiduciaries of large plans were prudently paying attention and using their scale to drive down costs by offering collective trusts.

120.    Since at least 2012, the DRiV Plan utilized a collective trust—the Mellon Stable Value Fund—as one of its investment options.

121.    Beginning in December 2019, the Tenneco Plan began to exclusively use collective trusts, with the exception of its money market and self-directed brokerage options, resulting in over 97% of the Tenneco Plan's assets ($525,720,887 out of $539,414,618) being transferred to collective trusts.

122.    The collective-trust-based T. Rowe Price Retirement Trust target-date series is substantially identical—other than the lower cost—to the mutual-fund-based T. Rowe Price Retirement Fund target-date series.

24

123. The T. Rowe Price Retirement Trust target-date series has the same portfolio management team, glidepath, subasset-class exposure, tactical allocation overlay, and underlying investments as the T. Rowe Price Retirement Funds target-date series.

124. At all times during the Class Period, the DRiV Plan had enough assets in its T. Rowe Price target-date mutual funds to qualify for their lower-cost collective trust counterpart.

125. Thus, at all times during the Class Period, Defendants could have offered the collective trust version of the T. Rowe Price target-date mutual funds in the DRiV Plan.

126. The T. Rowe Price collective trust target-date funds were as much as 65% less expensive than the identical mutual fund versions offered by the DRiV Plan.

127. Defendants failed to switch to the lower-cost collective trust version of the same investment in the DRiV Plan.

128. In simple terms, Defendants failed to switch to an investment option that was the same investment in a different wrapper at a much lower price. This failure reveals that Defendants did not prudently monitor the DRiV Plan's investment options and make decisions in the best interest of DRiV Plan participants.

129. Throughout the Class Period, the DRiV Plan's T. Rowe Price target-date mutual funds were significantly more expensive than their identical collective trust counterparts.

130. The following chart provides an example of how much more expensive the DRiV Plan's T. Rowe Price target-date mutual funds were than their identical collective trust counterparts in 2021:

| T. Rowe Price Target Date Mutual Fund in Plan | In-Plan Expense Ratio | Lower Cost T. Rowe Price Collective Trust | Expense Ratio | Percent Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Retirement 2010 | 0.49% | T. Rowe Price Retirement 2010 Tr-F | 0.37% | 32% |

| T. Rowe Price Retirement 2015 | 0.51% | T. Rowe Price Retirement 2015 Tr-F | 0.37% | 38% |
|---|---|---|---|---|
| T. Rowe Price Retirement 2020 | 0.53% | T. Rowe Price Retirement 2020 Tr-F | 0.37% | 43% |
| T. Rowe Price Retirement 2025 | 0.55% | T. Rowe Price Retirement 2025 Tr-F | 0.37% | 49% |
| T. Rowe Price Retirement 2030 | 0.58% | T. Rowe Price Retirement 2030 Tr-F | 0.37% | 57% |
| T. Rowe Price Retirement 2035 | 0.59% | T. Rowe Price Retirement 2035 Tr-F | 0.37% | 59% |
| T. Rowe Price Retirement 2040 | 0.60% | T. Rowe Price Retirement 2040 Tr-F | 0.37% | 62% |
| T. Rowe Price Retirement 2045 | 0.62% | T. Rowe Price Retirement 2045 Tr-F | 0.37% | 68% |
| T. Rowe Price Retirement 2050 | 0.63% | T. Rowe Price Retirement 2050 Tr-F | 0.37% | 70% |
| T. Rowe Price Retirement Balanced | 0.49% | T. Rowe Price Retirement Balanced Tr-F | 0.37% | 32% |

131.    The following chart provides an example of how much more expensive the DRiV Plan's T. Rowe Price target-date mutual funds were than their identical collective trust counterparts in 2020:

| T. Rowe Price Target Date Fund in Plan | In-Plan Expense Ratio | T. Rowe Price Lower Cost Collective Trust | Expense Ratio | Percent Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Retirement 2010 | 0.52% | T. Rowe Price Retirement 2010 Tr-F | 0.43% | 21% |
| T. Rowe Price Retirement 2015 | 0.55% | T. Rowe Price Retirement 2015 Tr-F | 0.43% | 28% |
| T. Rowe Price Retirement 2020 | 0.57% | T. Rowe Price Retirement 2020 Tr-F | 0.43% | 33% |
| T. Rowe Price Retirement 2025 | 0.61% | T. Rowe Price Retirement 2025 Tr-F | 0.43% | 42% |
| T. Rowe Price Retirement 2030 | 0.64% | T. Rowe Price Retirement 2030 Tr-F | 0.43% | 49% |
| T. Rowe Price Retirement 2035 | 0.67% | T. Rowe Price Retirement 2035 Tr-F | 0.43% | 56% |
| T. Rowe Price Retirement 2040 | 0.69% | T. Rowe Price Retirement 2040 Tr-F | 0.43% | 60% |
| T. Rowe Price Retirement 2045 | 0.71% | T. Rowe Price Retirement 2045 Tr-F | 0.43% | 65% |

| T. Rowe Price Retirement 2050 | 0.71% | T. Rowe Price Retirement 2050 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement Balanced | 0.50% | T. Rowe Price Retirement Balanced Tr-F | 0.43% | 16% |

132. The following chart provides an example of how much more expensive the DRiV Plan's T. Rowe Price target-date mutual funds were than their identical collective trust counterparts in 2019:

| T. Rowe Price Target Date Fund in Plan | In-Plan Expense Ratio | T. Rowe Price Lower Cost Collective Trust | Expense Ratio | Percent Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Retirement 2010 | 0.53% | T. Rowe Price Retirement 2010 Tr-F | 0.43% | 23% |
| T. Rowe Price Retirement 2015 | 0.56% | T. Rowe Price Retirement 2015 Tr-F | 0.43% | 30% |
| T. Rowe Price Retirement 2020 | 0.59% | T. Rowe Price Retirement 2020 Tr-F | 0.43% | 37% |
| T. Rowe Price Retirement 2025 | 0.63% | T. Rowe Price Retirement 2025 Tr-F | 0.43% | 47% |
| T. Rowe Price Retirement 2030 | 0.66% | T. Rowe Price Retirement 2030 Tr-F | 0.43% | 53% |
| T. Rowe Price Retirement 2035 | 0.68% | T. Rowe Price Retirement 2035 Tr-F | 0.43% | 58% |
| T. Rowe Price Retirement 2040 | 0.70% | T. Rowe Price Retirement 2040 Tr-F | 0.43% | 63% |
| T. Rowe Price Retirement 2045 | 0.71% | T. Rowe Price Retirement 2045 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement 2050 | 0.71% | T. Rowe Price Retirement 2050 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement Balanced | 0.51% | T. Rowe Price Retirement Balanced Tr-F | 0.43% | 19% |

133. The expense ratios in the other years of the Class Period were similar to the examples for the years shown above.

134. A prudent fiduciary conducting a prudent, impartial review of the DRiV Plan's investments would have identified the collective trust option and transferred the DRiV Plan's investments into the above-referenced collective trusts at the earliest opportunity.

135. Defendants failed to take such action, thereby acting imprudently.

27

136.    Because the marketplace for retirement plans is competitive and the DRiV Plan's pool of assets is large, it is plausible, and indeed reasonable, to infer that Defendants were asleep at the wheel or did not negotiate aggressively enough and are guilty of a failure of effort or competence and failure to act with the immediacy that ERISA requires.

137.    At all times during the Class Period, had Defendants utilized a prudent process and been properly discharging their duties for the exclusive benefit of the participants and allowing the participants to be charged only reasonable fees, Defendants would have known or should have known of the existence of the same T. Rowe Price target-date investment in the lower-cost collective trust offering and would therefore have promptly transferred the DRiV Plan's funds into these lower cost versions of the same investment options.

138.    Moreover, not only did Defendants fail to utilize the collective trust version of the T. Rowe Price target-date funds, they inexplicably included only the investor share class in the DRiV Plan instead of the cheaper, but identical, institutional share class of the funds.

139.    In December 2019, the Tenneco Plan stopped offering T. Rowe Price target-date mutual funds and began offering the T. Rowe Price target-date collective trust counterparts.

140.    Despite this 2019 change in the Tenneco Plan, Defendants still failed to switch the DRiV Plan's target-date fund option from the T. Rowe Price target-date mutual fund series to the T. Rowe Price target-date collective trust series.

141.    Failing to utilize the lower cost T. Rowe Price collective trust option in the DRiV Plan shows that Defendants did not employ a prudent, loyal process to select, monitor, remove, and retain investment options.

142.    As a result of Defendants' breach of their fiduciary duties, the DRiV Plan and its participants, including Frayer and Parker, incurred excessive investment fees, costing them

millions of dollars.

**Defendants selected and retained investment options that were more expensive than substantially similar alternative investment options available to the DRiV Plan.**

143. The DRiV Plan offered between 14 and 16 single asset class investment options during the Class Period.

144. At least eight of these single asset class investment options were more expensive, and in most cases considerably more expensive, than substantially similar alternative investment options available to the DRiV Plan.

145. These expensive funds, and examples of substantially similar lower-cost alternative investment options, are shown in the following chart, along with their applicable expense ratios (using, as an example, expense ratios as of March 31, 2022):

| In-Plan Option | Expense Ratio | Lower Cost Alternative Option | Expense Ratio | % Excess Cost |
|---|---|---|---|---|
| Mellon Stable Value M | 0.29% | T. Rowe Price Stable Value Common Tr-N | 0.20% | 45% |
| American AMCAP R6 (RAFGX) | 0.34% | Vanguard Growth Index Inst (VIGIX) | 0.04% | 750% |
| " " | 0.34% | TIAA-CREF Large-Cap Growth Index Inst (TILIX) | 0.05% | 580% |
| Goldman Sachs Gov Income Inst (GSOIX) | 0.54% | American Century Gov Bond R5 (ABTIX) | 0.27% | 100% |
| " " | 0.54% | Federated Total Return Gov Bond Inst (FTRGX) | 0.33% | 63.6% |
| Lazard Emerging Markets Equity Inst (LZEMX) | 1.11% | Schwab Fundamental EM Large Co (SFENX) | 0.39% | 184.6% |
| Fidelity Gov Money Market (SPAXX) | 0.42% | Vanguard Treasury Money Market (VUSXX) | 0.09% | 366.7% |
| " " | 0.42% | Vanguard Federal Money Market (VMFXX) | 0.11% | 281.8% |

146. The lower-cost investment option alternatives listed in the chart above performed comparably with or better than, and in some cases significantly better than, their comparable higher-cost option in the DRiV Plan.

147. The expense ratios for the in-plan and substantially similar alternative investment

options in the other years of the Class Period were similar to the expense ratios shown above, which are provided simply as a specific illustration.

148.    The substantially similar, but lower-cost, alternative investment options in the chart above were identified using an industry recognized software program that uses quantitative methods, such as returns-based and holdings-based correlation analysis, to find funds that are highly similar to the fund being analyzed, resulting in an apples-to-apples comparison.

149.    In addition to the similar, but lower-cost, alternative investment options identified above by Plaintiffs, Defendants also failed to lower fees in the DRiV Plan by simply replacing index funds from one investment company (Vanguard) with less expensive funds from another investment company (State Street), even though the Tenneco Plan has been offering the less expensive funds from State Street since about December 2019.

150.    Index funds are a type of fund that tracks the returns of a particular market index.

151.    Market indexes measure the performance of a "basket" of securities, like stocks or bonds. This "basket" of securities is supposed to represent a sector of an economy or stock market. A person may not invest directly in a market index, but they may invest in index indirectly through an index fund that tracks a market index.

152.    Generally, index funds are a passive style—meaning no fund manager is required— of investing, aiming to maximize returns over a long period of time by not buying and selling securities very often.

153.    Various investment companies may provide investment products that track the same index.

154.    For example, well-known investment companies such as Vanguard, Fidelity, and State Street all offer investment products that track the S & P 500 Index. However, the price of

these products, which track the exact same index, can vary by as much as 250%.

155.    Examples of substantially similar but lower-cost alternative index options are shown in the following chart, along with their applicable expense ratios (using, as an example, expense ratios as of May 2022):

| In-Plan Option | Expense Ratio | Lower Cost Alternative Option | Expense Ratio | % Excess Cost |
|---|---|---|---|---|
| Vanguard Institutional Index I (VINIX) | 0.035% | State Street S & P 500 Index II | 0.01% | 250% |
| Vanguard Total Bond Market Index I (VBTIX) | 0.04% | State Street U.S. Bond Index Fund | 0.02% | 100% |
| Vanguard Small Cap Index Fund Inst (VSCIX) | 0.04% | State Street Russell Small Cap Index | 0.023% | 73.9% |

156.    A prudent and loyal fiduciary would not have selected investment options that were significantly more expensive but performed no better (or worse) than substantially similar alternative investment options.

157.    No reasonable, prudent justification exists for Defendants' failure to offer these lower-cost alternatives.

158.    On July 1, 2022, after the original Complaint in this case was filed, the DRiV Plan was merged into the Tenneco Plan, and Defendants transferred over $100 million dollars of assets from the Vanguard products in the DRiV Plan to State Street products, thereby recognizing cost savings of the type identified above.

159.    Defendants did not remove expensive actively managed funds from the DRiV Plan.

160.    Of the DRiV Plan's 14 to 16 single-asset class options during the Class Period, approximately three were passively managed index funds whereas the majority were actively managed funds.

161.    In contrast to passively managed index funds, actively managed funds are handled by individuals who are actively picking securities and determining when to sell, leading to more

31

frequent purchases and sales with the ultimate goal of outperforming the market.

162. Typically, index funds have lower costs because, unlike actively managed funds, index fund managers are not actively picking securities and do not need supportive services, like research analysts, to help pick securities.

163. However, studies have repeatedly shown that actively managed funds do not outperform passively managed index funds in the long term.

164. On or around December 6, 2019, the following expensive, actively managed, single asset class investments were removed from the Tenneco Plan: the T. Rowe Price Blue Chip Growth Fund; the American Funds EuroPacific Growth Fund (also in the DRiV Plan); the Diamond Hill Small-Mid Cap Fund; the Lord Abbett High Yield Fund; the PIMCO Total Return Fund; the Vanguard Equity-Income Fund; and the Vanguard Mid-Cap Growth Fund.

165. But Defendants left the more expensive actively managed single asset class investments in the DRiV Plan from 2019 through July 1, 2022, including the American Funds EuroPacific Growth Fund that was removed from the Tenneco Plan in 2019.

166. Plaintiffs estimate that participants in the DRiV Plan paid more than $1.6 million in additional, unnecessary investment management fees in 2019 and over $1.8 million in additional, unnecessary investment management fees in 2020. Though publicly available information is not available after 2020, Plaintiffs expect the additional unnecessary investment management fees in 2021 could be well over $2 million.

**Defendants failed to offer the lowest-cost share classes of the funds offered by the DRiV Plan.**

167. Defendants also failed to take advantage of lower-cost share classes of the investment options they already offered in the DRiV Plan.

168.    Larger asset balances in 401(k) plans lead to economies of scale and special pricing with mutual funds and other investment products.

169.    For example, many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors with more expensive share classes generally targeted at smaller investors with less bargaining power, while lower cost shares are targeted at "institutional investors" with more assets (generally $1 million or more) and therefore greater bargaining power.

170.    Typically, there is no difference between share classes other than cost—*i.e.*, the funds hold identical investments and have the same manager.

171.    Fiduciaries must consider the size and purchasing power of their plan in selecting share classes or alternative investments.

172.    It is a foundational investment management principle that an investor with a larger amount to invest can qualify or negotiate for lower fees.

173.    Large defined contribution plans, such as the DRiV Plan, qualify for lower-cost share classes and alternative investments because of their size and purchasing power.

174.    Prudent fiduciaries will search for and select the lowest-priced share class available as quickly as possible.

175.    During the Class Period, Defendants failed to offer the lowest-cost share class of the already in-plan mutual funds that were available to the DRiV Plan.

176.    No reasonable, prudent justification exists for Defendants' failure to offer the lowest-cost share class available.

177.    At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes of the mutual funds offered in the DRiV Plan and thus also

should have promptly identified the prudence of transferring the DRiV Plan's funds into the lower-cost share classes of said mutual funds.

178.    As demonstrated below, Defendants failed to ensure that the DRiV Plan and its participants were invested in the lowest-cost share class available for the DRiV Plan's investment options and did not promptly switch to these lower-cost alternatives when they became available.

179.    The following chart provides an example of how much more expensive the funds in the DRiV Plan were than their identical, lower-cost counterparts (using 2020 expense ratios):

| In-Plan Option | In-Plan Expense Ratio | Lower Cost Institutional Class Shares | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| DWS RREEF Real Estate Securities Instl | 0.63% | DWS RREEF Real Estate Securities R6 | 0.54% | 17% |
| Fidelity Low-Priced Stock K | 0.69% | Fidelity Low-Priced Stock K6 | 0.50% | 38% |

180.    No prudent, loyal reason exists for not having offered, or for not have switched and more promptly offered the DRiV Plan's participants lower-cost share classes of the same funds.

181.    Had Defendants engaged in a prudent, loyal process to select, monitor, retain, and remove investment options from the DRiV Plan, they would have utilized the lower-cost share classes of the mutual funds in the DRiV Plan. Defendants' failures in this regard caused the DRiV Plan and its participants to pay unnecessary fees.

182.    Failing to move funds in the DRiV Plan to available lower price share classes shows that Defendants did not employ a prudent, loyal process to select, monitor, remove, and retain investment options.

**Defendants allowed excessive fees to be charged to DRiV Plan participants for managed-account services.**

183.    During the Class Period, Defendants included managed account services as an option for DRiV Plan participants.

184. These services are another clear indication of the Defendants' imprudent fee-monitoring process, as the fees charged to DRiV Plan participants for managed-account services during the Class Period were excessive.

185. Managed-account services are investment services under which a participant pays a fee to have a managed-account provider invest his or her account in a portfolio of preselected investment options.

186. Managed-account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." U.S. Gov't Accountability Off., *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts* 14 (June 2014).

187. The assets of a participant using a plan's managed-account services are managed by a managed-account provider using a program from the provider that purports to customize the participant's investment portfolio based on factors such as the participant's risk tolerance and the number of years before the participant will retire.

188. In practice, there may be little customization provided to the participant, which results in no material value to most, if not all, participants relative to the fees paid.

189. Many managed-account services do what is already available through a target-date fund while charging additional unnecessary fees for the "service."

190. These fees are generally based on a percentage of the participant's account balance and are charged annually.

191. Fee rates for managed-account services may be tiered. For example, the first $100,000 of assets may be charged at a certain fee rate, the next $150,000 in assets at a lower fee rate, and all remaining assets at a still-lower fee rate.

35

192. Notably, the marginal cost to manage the additional assets for the participant is essentially $0. For instance, a managed-account provider's cost to manage a participant account worth $100,000 is the same as its cost to manage a participant account worth $800,000.

193. Plan participants have no control over the fee rate charged for managed-account services because that rate is set for participants by the plan's contract with the managed-account provider—a contract evaluated and entered into by the plan's fiduciaries.

194. Throughout the Class Period (and long before), large plans have been able to negotiate the fee rates charged by managed-account providers as well as other facets of the provider's fees, such as the asset levels at which a particular fee tier starts and the fee rate charged for each asset level.

195. Managed-account services are often offered by recordkeepers to increase the revenue they generate through their relationship with a plan.

196. In many cases, recordkeepers will promote the managed-account services (including promoting their own service) over other potential solutions because they will earn more revenue when participants use the managed-account services.

197. Like with all plan service providers, fees are one of the most important factors for fiduciaries to consider when selecting a managed-account provider.

198. Managed-account services have historically been expensive compared to other alternatives, such as target-date funds, that provide a substantially similar (if not the same) service (e.g., an automated asset allocation creation and rebalancing solution).

199. Due to increased competition, the cost of providing managed-account services has declined.

200. As a result, the fees providers are willing to accept for managed-account services

have been declining for many years.

201. To satisfy their duty of prudence under ERISA, Defendants were required to monitor the DRiV Plan's managed-account fees, and, if those fees were imprudent, make appropriate changes.

202. As with any plan service, prudent fiduciaries regularly monitor the amount of fees charged by the plan's managed-account provider and ensure those fees are reasonable compared to what is available in the market for substantially the same, or actually the same, services.

203. A prudent fiduciary therefore changes managed-account providers or removes managed-account services from the plan when the fees charged are not reasonable compared to the services provided and the prevailing market rate for the same or substantially similar services.

204. Prudent fiduciaries know that the most effective way to ensure a plan's managed-account service fees are reasonable is to periodically solicit bids from other managed-account providers, stay abreast of the market rates for managed-account services, and/or negotiate most-favored nation clauses with the plan's managed-account provider.

205. Defendants took none of the steps that a prudent fiduciary would, which caused DRiV Plan participants to pay excessive fees for the managed-account services offered DRiV Plan participants.

206. In 2016 and 2017, Defendants hired Edelman Financial Engines as the DRiV Plan's managed-account provider.

207. Edelman Financial Engines is an independent entity and not affiliated with Fidelity, but paid Fidelity a fee.

208. From 2018 on, Defendants elected to use Fidelity's proprietary Personalized Planning and Advice service, which in turn used the services of Strategic Advisers, LLC (a

subsidiary of Fidelity), as the DRiV Plan's managed-account provider.

209.    Fidelity, which was also the DRiV Plan's recordkeeper at the time, and its subsidiaries were thus paid all managed-account fees paid by DRiV Plan participants instead of being paid only a portion of the fee charged by an independent entity.

210.    Plaintiffs Frayer and Parker utilized the DRiV Plan's managed-account services throughout the Class Period and paid excessive fees for them.

211.    During the Class Period, DRiV Plan participants paid more than $3 million dollars in managed-account fees:

| Year | Provider | Total |
|------|----------|-------|
| 2016 | Edelman Financial Engines | $ 572,931.00 |
| 2017 | Edelman Financial Engines | $ 815,497.00 |
| 2018 | Fidelity (Strategic Advisers) | $ 755,582.00 |
| 2019 | Fidelity (Strategic Advisers) | $ 899,695.00 |
| 2020 | Fidelity (Strategic Advisers) | $ 376,744.00 |
| 2021 | Fidelity (Strategic Advisers) | Not available |
| 2022 | Fidelity (Strategic Advisers) | Not available |

212.    While fees undoubtedly varied over the Class Period, the DRiV Plan's Participant Disclosure Notice dated April 25, 2022 states that the fee for the managed-account service is estimated not to exceed 0.39% per year of your average daily managed account balance and is deducted quarterly.

213.    The table below shows that similar services were available for significantly lower fees from other providers:

| Provider | Fee | Percent Fidelity's Fee Is Higher |
|----------|-----|----------------------------------|
| Fidelity Personalized Planning & Advice Fee | 0.39% | N/A |
| Morningstar | 0.35% | 11% |
| Vanguard Personal Advisor | 0.30% | 30.0% |

| Russell Personal Retirement Account | 0.205% for plans at $500M to $1B | 90% |
|---|---|---|
| Betterment | 0.25% for any size plan/account. Fee can be as low as 0.12% for plans over $40 million | As much as 225% more |

214.   As illustrated above, Frayer, Parker, and other DRiV Plan participants paid fee rates significantly higher than fees for similar managed account services.

215.   Many of the above-referenced service providers will charge much less in fees for plans that are much smaller than the DRiV Plan.

216.   As a result, the fee rates paid by Frayer, Parker, and DRiV Plan participants for the DRiV Plan's managed-account services were excessive and not reasonable given the DRiV Plan's size and negotiating power.

217.   The asset allocations created by the managed-account services offered to DRiV Plan participants do not generally differ materially from asset allocations provided by the age-appropriate target-date fund options that are ubiquitous in the market and available to the DRiV Plan throughout the Class Period.

218.   Other purported benefits of managed-account services such as increased participation and savings rates could have easily been achieved using automatic default and increase provisions at little to no additional cost to participants.

219.   The purpose of the managed-account services included in the DRiV Plan is identical:  provide an automated asset allocation, creation, and rebalancing solution/program that reallocates the participant's asset allocation over time as circumstances change.

220.   The managed-account services provided to Frayer, Parker, or other DRiV Plan participants did not warrant or justify the DRiV Plan paying higher fees than similarly situated

plans that used other service providers and/or simply leveraged their negotiating power.

221. The DRiV Plan's managed-account allegations are not about reasonable tradeoffs between managed-account providers that offer—or may offer—a different level or quality of services. Rather, Plaintiffs' allegations focus on Defendants' failure to take advantage of the DRiV Plan's size to negotiate lower fees from its existing managed-account provider and the fact that Defendants could have obtained virtually, or at the least materially, the same managed-account services for less through another provider if they had properly solicited competitive bids for the same services.

222. A prudent fiduciary changes managed-account providers or removes managed-account services from the plan when the fees charged are not reasonable compared to the services provided and the prevailing market rate for the same or substantially similar services.

223. In addition, a prudent fiduciary would have, at the least, evaluated the incremental value provided to DRiV Plan participants by managed-account services to ensure that the amounts paid by the DRiV Plan for managed-account services were reasonable, periodically solicited competitive bids from managed-account providers, generally stayed abreast of the market rates for managed-account services, and evaluated whether to providing managed-account services as a plan option was prudent and removing said services if they were not.

224. Based on the excessive fees charged by the DRiV Plan's managed-account provider during the Class Period, it is reasonable (and necessary) to infer that Defendants took none of these steps, nor any other steps that a prudent, loyal fiduciary would have taken.

225. Also, based on the value provided compared with the lower-cost alternatives, a reasonable fee for the DRiV Plan's managed-account services would have been significantly less than the fee charged, which cost the DRiV Plan participants millions of dollars in wasted managed-

account service fees.

226. Had Defendants fulfilled their duties under ERISA and engaged in a prudent and loyal process to select, monitor, retain, replace, or eliminate the DRiV Plan's managed-accounts provider, these failures would not have occurred and Frayer, Parker, and other DRiV Plan participants would not have paid excessive and unreasonable fees for the DRiV Plan's managed-account services.

**Defendants allowed the DRiV Plan's participants to
pay excessive recordkeeping and administrative fees.**

227. Another indication of Defendants' imprudent fee-monitoring process is the excessive recordkeeping and administrative fees the DRiV Plan's participants paid during the Class Period.

228. It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. To satisfy their duty of prudence under ERISA, Defendants were required to monitor the DRiV Plan's recordkeeping fees, and, if those fees were imprudent, make appropriate changes.

229. Defendants failed to satisfy their duty of prudence by allowing the DRiV Plan's recordkeeper to charge excessive recordkeeping fees to the DRiV Plan and its participants.

230. Here, the word recordkeeping includes administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."

231. All national recordkeepers for large plans with substantial bargaining power (like the DRiV Plan and the Tenneco Plan) offer two categories of recordkeeping services: bundled services and individual services.

232. In the first category, national recordkeepers offer large plans an overall suite of recordkeeping services as part of a "bundled" fee for a buffet of services on an "all-you-can-eat"

41

basis, including, but not limited to, the following services: recordkeeping, transaction processing, participant communications, plan document services, plan consulting services, accounting and audit services (*e.g.*, Form 5500 preparation), compliance support, trust services, custody, and compliance testing to ensure the plan remains qualified under IRS rules.

233. These "bundled" services are offered by all recordkeepers for one price (*e.g.*, pro rata or per capita) regardless of the services chosen or used by the plan.

234. The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

235. In the second category, national recordkeepers offer large plans individual services, such as loan processing, self-directed brokerage account maintenance (if offered by the plan), distribution services, and processing of qualified domestic relations orders, on an á la carte basis.

236. These individual services often have separate, additional fees based on individual participants' conduct and usage of services.

237. Individual services fees are distinct from the bundled arrangement, described above, to ensure that one participant is not forced to help another participant cover the cost of, for example, another participant taking a loan from her own plan account balance.

238. All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the DRiV Plan.

239. The cost of providing recordkeeping services often depends on the number of participants in a plan. Plans with a large number of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

240.    Recordkeeping expenses can be paid directly from plan assets, indirectly by the plan's investments (in a practice known as revenue sharing), with a combination of both direct payment and revenue sharing, or in whole or in part by a plan sponsor.

241.    Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

242.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for plan participants.

243.    "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, *Revenue Sharing and Invisible Fees*, CC Coaching & Consulting, http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited May 15, 2022).

244.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

245.    To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require

43

that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

246.    Further, plan fiduciaries subject to ERISA must engage in on-going monitoring to make sure that plan recordkeeping fees are reasonable.

247.    Although Plaintiffs are limited to evidence that can be found in publicly available information about the DRiV Plan, that evidence supports Plaintiffs' allegations that Defendants failed to prudently monitor recordkeeping fees.

248.    The table below shows that when the DRiV Plan was compared to a peer group comprised of plans in the same business category with over 5,000 participants (over 50 plans met that criteria), DRiV Plan participants routinely paid significantly higher recordkeeping fees than participants in comparable plans: [3]

| Year | DRiV Plan Per Participant Recordkeeping Fee | Peer Group Median Per Participant Recordkeeping Fee | Percent DRiV Plan's Fee is Higher | DRiV Plan Expense/Participant Percentile Rank |
|---|---|---|---|---|
| 2016 | $    120.00 | $    50.00 | 140% | Worst 25% |
| 2017 | $    140.00 | $    65.00 | 115% | Worst 25% |
| 2018 | $    120.00 | $    65.00 | 85% | Worst 25% |
| 2019 | $     81.00 | $    58.00 | 40% | Worst 25% |
| 2020 | $     69.00 | $    63.00 | 10% | Worst 50% |
| 2021 | Information not publicly available | | | |
| 2022 | Information not publicly available | | | |

249.    Additional analysis based on publicly available information shows that when the DRiV Plan's recordkeeping fees are stacked up against the plans surveyed by NEPC[4], DRiV Plan

_____

[3] This table includes publicly available information reported on the DRiV Plan's Form 5500s as analyzed by a third-party benchmarking service. Administrative expense per participant was determined by dividing the total operating expenses paid by the plan by the total active participants in the plan at the end of the year. Dollar amounts for 2016 through 2018 are estimated from information provided by the third-party benchmarking service.

[4] NEPC, LLC is one of the industry's largest independent, full-service investment consulting firms, serving

participants were being charged higher fees overall than other plans of similar size, and, in some years, well over double what participants of similar-sized plans were paying:

| Year | DRiV Plan Participants as of Year End | DRiV Plan Per Participant Recordkeeping Fee | Per Participant Recordkeeper Median Fee or Range (10,000–15,000 participants) |
|---|---|---|---|
| 2016 | 10,292 | $120.00 | $53.00 |
| 2017 | 10,491 | $140.00 | $53.00 |
| 2018 | 10,498 | $120.00 | Not available |
| 2019 | 15,333 | $81.00 | $35 to $80 |
| 2020 | 10,085 | $69.00 | $35 to $70 |
| 2021 | INFORMATION NOT AVAILABLE | | |
| 2022 | INFORMATION NOT AVAILABLE | | |

250. Because the DRiV Plan paid yearly amounts in recordkeeping fees that were generally well above industry standards during the Class Period, and has continued to use the same recordkeeper since at least 2014, nothing suggests that Defendants appropriately monitored the recordkeeping marketplace (whether by request for proposals, request for information, benchmarking, or other prudent methodologies) to determine whether the DRiV Plan could obtain better recordkeeping and administrative fee pricing from other service providers.

251. The market for recordkeeping is highly competitive, with many vendors equally capable of providing the same kind of services and level of services provided by the DRiV Plan's recordkeeper, if not a higher-level service.

252. For example, there are more than forty national recordkeepers that Defendants could have selected.

---

more than 400 clients with over $1.3 trillion in assets under advisement. NEPC, LLC, Overview, LinkedIn https://www.linkedin.com/company/nepc (last visited May 15, 2022). NEPC has conducted an annual survey of defined contribution plans for over 15 years.

253. Any argument or allegation that the services provided by the DRiV Plan's recordkeeper is so unique it cannot be replicated, evaluated, or compared to any other recordkeeper is contrary to the reality of the recordkeeping market.

254. The devastating effect of unchecked recordkeeping fees is seen clearly here and cost DRiV Plan participants millions of dollars in unnecessary and excess recordkeeping fees.

255. DRiV Plan participants were notified that, effective July 1, 2022, in conjunction with the merging of the DRiV Plan into the Tenneco Plan, recordkeeping fees would be $39.50 per participant per year. This provides further factual support to the allegation that, had Defendants acted prudently, they could have substantially reduced recordkeeping fees.

256. Had Defendants properly discharged their fiduciary duties in accordance with ERISA, they would have continually monitored recordkeeping fees and obtained reductions that were in line with the market. Defendants' failure to do so resulted in damages to the DRiV Plan and a reduction in retirement benefits for the DRiV Plan's participants.

**The fiduciaries of the Tenneco Plan failed
to administer the plan in a prudent manner.**

257. Based upon the most recent data available to Plaintiffs, the Tenneco Plan had over $500 million in assets and was in the top 0.2% of all 401(k) plans based on plan assets throughout the Class Period.

258. As described above, Defendants were fiduciaries of the Tenneco Plan.

259. Based on alleged facts and the reasonable inferences regarding these facts, Defendants failed to administer the Tenneco Plan in a prudent manner, in violation of their fiduciary duties, in certain respects.

**Defendants failed to timely replace the T. Rowe Price target date
mutual funds offered by the Tenneco Plan with substantively identical,
but much less expensive, investment trust versions of these same funds.**

46

260. As discussed above, beginning in about 2019, Defendants did remove the T. Rowe Price target-date mutual funds from the Tenneco Plan and replace them with their less costly, yet virtually identical, T. Rowe Price collective trust counterparts. As a result, all participants' assets in these target date mutual funds were transferred to the corresponding investment trust versions.

261. However, Defendants failed to do so in a timely manner. Due to its size, the Tenneco Plan was eligible to qualify for the T. Rowe Price target-date collective trusts throughout the Class Period.

262. Had Defendants utilized a prudent process and been properly discharging their duties for the exclusive benefit of the participants and allowing the participants to be charged only reasonable fees, Defendants would have identified the prudence of switching from these target date mutual funds to the equivalent investment trusts at an earlier date.

263. The following table provides an example of how much more expensive the Tenneco Plan's T. Rowe Price target-date mutual funds were than their identical collective trust counterparts in 2019:

| T. Rowe Price ("TRP") Target Date Fund In Plan | In-Plan Expense Ratio | TRP Lower Cost Collective Trust Expense Ratio | % Fee Excess |
|---|---|---|---|
| T. Rowe Price Retirement 2010 | 0.53% | 0.40% | 33% |
| T. Rowe Price Retirement 2015 | 0.56% | 0.40% | 40% |
| T. Rowe Price Retirement 2020 | 0.59% | 0.40% | 48% |
| T. Rowe Price Retirement 2025 | 0.63% | 0.40% | 58% |
| T. Rowe Price Retirement 2030 | 0.66% | 0.40% | 65% |
| T. Rowe Price Retirement 2035 | 0.68% | 0.40% | 70% |
| T. Rowe Price Retirement 2040 | 0.70% | 0.40% | 75% |
| T. Rowe Price Retirement 2045 | 0.71% | 0.40% | 78% |
| T. Rowe Price Retirement 2050 | 0.71% | 0.40% | 78% |
| T. Rowe Price Retirement 2055 | 0.71% | 0.40% | 78% |
| T. Rowe Price Retirement 2060 | 0.71% | 0.40% | 78% |

264. The following table provides an example of how much more expensive the Tenneco Plan's T. Rowe Price target-date mutual funds were than their identical collective trust counterparts in 2018:

| TRP Target Date Fund In Plan | In-Plan Expense Ratio | TRP Lower Cost Collective Trust Expense Ratio | % Fee Excess |
|---|---|---|---|
| T. Rowe Price Retirement 2005 | 0.54% | 0.43% | 26% |
| T. Rowe Price Retirement 2010 | 0.54% | 0.43% | 26% |
| T. Rowe Price Retirement 2015 | 0.57% | 0.43% | 33% |
| T. Rowe Price Retirement 2020 | 0.61% | 0.43% | 42% |
| T. Rowe Price Retirement 2025 | 0.64% | 0.43% | 49% |
| T. Rowe Price Retirement 2030 | 0.67% | 0.43% | 56% |
| T. Rowe Price Retirement 2035 | 0.70% | 0.43% | 63% |
| T. Rowe Price Retirement 2040 | 0.72% | 0.43% | 67% |
| T. Rowe Price Retirement 2045 | 0.72% | 0.43% | 67% |
| T. Rowe Price Retirement 2050 | 0.72% | 0.43% | 67% |
| T. Rowe Price Retirement 2055 | 0.72% | 0.43% | 67% |
| T. Rowe Price Retirement 2060 | 0.72% | 0.43% | 67% |

265. The expense ratios in other years during the Class Period were similar to the examples for the years shown above.

266. Moreover, not only did Defendants fail to utilize the collective trust version of the T. Rowe Price target-date line in the Tenneco Plan, prior to December 2019 they also offered the more expensive investor share class of the T. Rowe Price target-date mutual funds, rather than the cheaper (yet identical) institutional share class.

267. A prudent fiduciary conducting a prudent, impartial review of the Tenneco Plan's investments would have identified the collective trust option and transferred the Tenneco Plan's investments into the above-referenced collective trusts line at the earliest opportunity.

268. Defendants failed to take such action, acting imprudently with respect to the

48

Tenneco Plan.

269.     Thus, for the same reasons discussed above with respect to the DRiV Plan, failing to switch the Tenneco Plan's T. Rowe Price target date funds to the collective trust versions prior to December 2019 shows that Defendants did not employ a prudent, loyal process to select, monitor, remove, and retain investment options.

**Defendants selected and retained investment options that were more expensive than substantially similar alternative investment options available to the Tenneco Plan.**

270.     In addition to failing to timely switch to T. Rowe Price's target-date collective trust series, Defendants left other expensive investment options in the Tenneco Plan despite the availability of cheaper, equally well performing (and sometimes better performing) alternatives that were substantially similar to funds in the Tenneco Plan.

271.     The Tenneco Plan had at least thirteen single asset class investment options from 2016 through December 5, 2019.

272.     Of those options, and throughout the Class Period, at least five of the index funds offered to Tenneco Plan participants were more expensive, and in most cases considerably more expensive, than substantially similar options that were available to the Tenneco Plan.

273.     Defendants failed to timely lower fees in the Tenneco Plan by simply replacing index funds from one investment company (Vanguard) with far less expensive funds from another investment company (State Street)—even though they later did so on or around December 6, 2019.

274.     The table below provides some examples of substantially similar, but lower-cost, index-fund options available to the Tenneco Plan (expense ratios as of Dec. 31, 2019 for example):

| In-Plan Option | Expense Ratio | Lower Cost Alternative Option | Expense Ratio | % Excess Cost |
|---|---|---|---|---|
| Vanguard Institutional Index I (VINIX) | 0.035% | State Street S & P 500 Index II | 0.01% | 250% |
| Vanguard Total Bond Market | 0.04% | State Street U.S. Bond | 0.02% | 100% |

| Index I (VBTIX) | | Index Fund | | |
|---|---|---|---|---|
| Vanguard Mid Cap Index Fund Inst (VMCIX) | 0.04% | State Street S&P Midcap Index SL CI XIV | .02% | 100% |
| Vanguard Total Int'l Stock Index I (VTSNX) | 0.08% | State St Sbl AllCp Eq ex-US Idx SL C1 II | .05% | 60% |
| " " | 0.08% | Fidelity Global ex US Index | .06% | 33% |

275.    The lower-fee options listed in the table above performed comparably with or better than the listed option in the Tenneco Plan.

276.    The expense ratios for the in-plan and substantially similar alternative investment options in other years of the Class Period were similar to the expense ratios, as of December 31, 2019, identified above (which are provided simply as a specific illustration).

277.    A prudent and loyal fiduciary would not have selected investment options that were significantly more expensive but performed no better or worse than substantially similar alternative options.

278.    No reasonable, prudent justification exists for Defendants' failure to offer lower cost index fund alternatives.

279.    Defendants' failure to monitor investment options and identify and implement (or timely identify and implement) substantially similar, comparably performing, lower cost alternatives during the Class Period for the Tenneco Plan cost the Tenneco Plan and its participants hundreds of thousands of dollars.

280.    Had Defendants fulfilled their duties under ERISA and engaged in a prudent and loyal process to select, monitor, retain, and remove investment options from the Tenneco Plan, these failures would not have occurred.

**Defendants allowed the Tenneco Plan's
participants to pay excessive recordkeeping fees.**

281. Another clear indication of Defendants' imprudent fee-monitoring process is the excessive recordkeeping Tenneco Plan participants paid during the Class Period.

282. Defendants allowed the Tenneco Plan's recordkeeper to charge excessive recordkeeping fees to the Tenneco Plan and its participants.

283. Publicly available data for the Tenneco Plan indicates its participants were being charged higher fees overall when compared to other plans of similar size surveyed by NEPC:

| Year | Tenneco Plan Participants as of Year End | Tenneco Plan Per Participant Fee | Per-Participant Recordkeeper Average for plans in 5,000 to 10,000 participants *(median for 2017)* |
|---|---|---|---|
| 2017 | 6177 | $ 97.51 | $ 50.00 |
| 2018 | 6212 | $ 91.47 | $ 52.00 |
| 2019 | 6090 | $ 102.12 | $ 55.00 |
| 2020 | 9482 | $ 51.00 | $ 46.00 |
| 2021 | Information not publicly available | | |
| 2022 | Information not publicly available | | |

284. Because the Tenneco Plan paid yearly amounts in recordkeeping fees that were generally well above industry standards during the Class Period and continued to use the same recordkeeper, it can be inferred that Defendants failed to appropriately monitor the recordkeeping marketplace to determine whether the Tenneco Plan could obtain better recordkeeping and administrative fee pricing from other service providers.

285. As discussed above, the market for recordkeeping is highly competitive and many other vendors were equally capable of providing the same services and level of service—or a higher level of service—to the Tenneco Plan as those selected by Defendants.

51

286.    In fact, as of July 1, 2022, the Tenneco Plan recordkeeping fees were lowered to $39.50 per participant per year.

287.    The prior devastating effect of unchecked recordkeeping fees cost Tenneco Plan participants millions of dollars in unnecessary and excess recordkeeping fees.

288.    Had Defendants properly discharged their fiduciary duties in accordance with ERISA, they would have continually monitored recordkeeping fees and negotiated reductions that were in line with the market. Defendants' failure to do so resulted in damages to the Tenneco Plan and a reduction in retirement benefits for Tenneco Plan participants.

## CLASS ACTION ALLEGATIONS

289.    In addition to bringing this action on behalf of the Plans, pursuant to ERISA, Plaintiffs also bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all participants in and beneficiaries of the Plans during the six-year period preceding May 27, 2022 through judgment, with the exception of Defendants, Defendants' beneficiaries, and Defendants' immediate families (the "Class").

290.    The Class potentially may be comprised of the following two subclasses:

(a) DRiV Plan Subclass: All participants in and beneficiaries of the DRiV Plan during the six-year period preceding May 27, 2022 through judgment, with the exception of Defendants, Defendants' beneficiaries, and Defendants' immediate families.

(b) Tenneco Plan Subclass: All participants in and beneficiaries of the Tenneco Plan during the six-year period preceding the filing of this Amended Complaint through judgment, with the exception of Defendants, Defendants' beneficiaries, and Defendants' immediate families.

291.    The Class will include more than 19,567 persons, but the precise number of class members is unknown to Plaintiffs.

292.    Plaintiffs Frayer and Parker seek to represent the DRiV Plan Subclass, whereas Farrier seeks to represent the Tenneco Plan Subclass.

52

293. Plaintiff Parker, like other participants in the DRiV Plan as of July 1, 2022, is now a participant in the Tenneco Plan.

294. Some members of the Class may have been previously moved from the Tenneco Plan to the DRiV Plan, or vice-versa, pursuant to Tenneco's restructuring.

295. Certification of the Class (and, if necessary, its subclasses) is appropriate under Rule 23(a) and Rule 23(b)(1), (b)(2), and/or (b)(3).

296. The Class (and its subclasses) satisfy the numerosity requirement because they are composed of thousands of persons in numerous locations.

297. The Plans had thousands of participants and beneficiaries in every year of the Class Period, all of whom suffered from the imprudent investment options and excessive and improper fees alleged herein.

298. The number of Class and subclass members is so large that joinder of all its members is impracticable.

299. There are questions of law and fact common to the Class (and its subclasses) and these questions predominate over questions affecting only individual class members.

300. Common legal and factual questions include, but are not limited to:

    (a) Whether Defendants were fiduciaries responsible for monitoring and making decisions with respect to the investments in the Plans and services for the Plans;

    (b) Whether the investment decisions made by Defendants were prudent;

    (c) Whether the investment decisions made by Defendants were solely in the interests of the Plans' participants and beneficiaries;

    (d) Whether the defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plans were being managed in compliance with ERISA;

    (e) Whether the Plans suffered losses as a result of Defendants' fiduciary breaches; and

(f) Whether Defendants' acts proximately caused losses to the Plans and, if so, the appropriate relief to which Plaintiffs, on behalf of the Plans and the Class, are entitled.

301.    Plaintiffs' claims are typical of the claims of the members of the Class (or subclass) because Plaintiffs' claims, and the claims of all class members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class (or subclass) are similarly affected by Defendants' wrongful conduct.

302.    Plaintiffs will fairly and adequately represent the Class (or subclass) and have retained counsel competent in the prosecution of ERISA class-action litigation.

303.    Plaintiffs have no interests antagonistic to those of other members of the Class.

304.    Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

305.    Plaintiffs have standing to bring this action on behalf of the Plans because they are participants in the Plans and were injured by Defendants' unlawful conduct.

306.    Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently or as of the time the account was distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

307.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system with respect to the resolution of the issues raised in this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court. This case presents no unusual management difficulties.

308. Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

309. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

310. In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

311. In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### First Claim for Relief: Breach of ERISA Fiduciary Duties as to the DRiV Plan

312. Plaintiffs reallege and incorporate by reference all other allegations in this Amended Complaint as if fully set forth herein.

313. At all relevant times, the Tenneco Benefits Committee and its members, as well as Tenneco, DRiV, and/or Tenneco Automotive and certain of their officers, employees, contractors, and/or agents, were fiduciaries of the DRiV Plan within the meaning of 29 U.S.C. § 1002(21)(A),

in that they exercised discretionary authority or control over the administration and/or management of the DRiV Plan or disposition of the DRiV Plan's assets.

314. As explained above, these Defendants breached their fiduciary duties to the DRiV Plan and its participants and beneficiaries in multiple respects and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

315. As detailed above, these Defendants had fiduciary responsibilities with respect to selecting, monitoring, retaining, and removing investment options in the DRiV Plan and minimizing recordkeeping and managed-account services fees.

316. As detailed above, these Defendants caused the DRiV Plan to invest millions of dollars in investment options that were not in keeping with their fiduciary responsibilities, failed to leverage the size of the DRiV Plan to minimize costs, and failed to monitor and minimize the DRiV Plan's recordkeeping and managed-account service costs.

317. By the conduct and omissions described above, these Defendants failed to discharge their duties with respect to the DRiV Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the DRiV Plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

318. By the conduct and omissions described above, these Defendants failed to discharge their duties with respect to the DRiV Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

319. These Defendants knowingly participated in the breaches of each of the other of these Defendants, knowing that such acts were a breach, enabled the other of these Defendants to commit breaches by failing to lawfully discharge such defendant's own duties, and knew of the violations by the other of these Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

320. Accordingly, each of these Defendants is also liable for the violations by its co-fiduciaries under 29 U.S.C. § 1105(a). As a direct and proximate result of these breaches of fiduciary duties, the DRiV Plan and its participants have paid substantial excess investment management, recordkeeping, managed-account services, and other related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which these Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109 and 29 U.S.C. § 1132(a)(2).

321. The DRiV Plan and its participants suffered millions of dollars of losses due to these excessive costs and lower net investment returns.

322. If these Defendants had complied with their fiduciary obligations, then the DRiV Plan would not have suffered these losses, and DRiV Plan participants would have more money available to them for their retirement.

323. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), these Defendants are liable to restore to the DRiV Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

324. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for these Defendants' breaches as set forth in their Prayer for Relief.

**Second Claim for Relief: Breach of ERISA Fiduciary Duties as to the Tenneco Plan**

325. Plaintiffs reallege and incorporate by reference all other allegations in this Amended Complaint as if fully set forth herein.

326. At relevant times, the Tenneco Benefits and Pension Investment Committee and its members, as well as Tenneco, Tenneco Automotive, Federal-Mogul Corporation, Federal-Mogul LLC, and Federal-Mogul Powertrain LLC and certain of their officers, employees, contractors, entities, and/or agents, were fiduciaries of the Tenneco Plan within the meaning of 29 U.S.C. § 1002(21)(A) (ERISA § 3(21)(A)), in that they exercised discretionary authority or control over the administration and/or management of the Tenneco Plan or disposition of the Tenneco Plan's assets. Tenneco has assumed Federal-Mogul LLC's fiduciary liability, as well as its predecessor's liability, by virtue of its acquisition of Federal-Mogul LLC.

327. As the fiduciaries of the Tenneco Plan, these Defendants breached their fiduciary duties to the Tenneco Plan and its participants and beneficiaries in multiple respects and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

328. As detailed above, these Defendants had fiduciary responsibilities with respect to selecting, monitoring, retaining, and removing investment options in the Tenneco Plan and minimizing recordkeeping fees.

329. As detailed above, these Defendants caused the Tenneco Plan to invest millions of dollars in investment options that were not in keeping with their fiduciary responsibilities, failed to leverage the size of the Tenneco Plan to minimize costs, and failed to monitor and minimize the Tenneco Plan's recordkeeping costs.

330. By the conduct and omissions described above, these Defendants failed to discharge their duties with respect to the Tenneco Plan solely in the interest of the participants and

beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Tenneco Plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

331. By the conduct and omissions described above, these Defendants failed to discharge their duties with respect to the Tenneco Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

332. These Defendants knowingly participated in the breaches of each of the other of these Defendants, knowing that such acts were a breach, enabled the other of these Defendants to commit breaches by failing to lawfully discharge such defendant's own duties, and knew of the violations by the other of these Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

333. Accordingly, each of these Defendants is also liable for the violations by its co-fiduciaries under 29 U.S.C. § 1105(a). As a direct and proximate result of these breaches of fiduciary duties, the Tenneco Plan and its participants have paid substantial excess investment management, recordkeeping, managed-account services, and other related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which these Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109 and 29 U.S.C. § 1132(a)(2).

334. The Tenneco Plan and its participants suffered millions of dollars of losses due to these excessive costs and lower net investment returns.

335.    If these Defendants had complied with their fiduciary obligations, then the Tenneco Plan would not have suffered these losses, and Tenneco Plan participants would have more money available to them for their retirement.

336.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Tenneco Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

337.    In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for these Defendants' breaches as set forth in their Prayer for Relief.

**Third Claim for Relief: Failure to Adequately Monitor Other Fiduciaries as to the DRiV Plan**

338.    Plaintiffs reallege and incorporate by reference all other allegations in this Amended Complaint as if fully set forth herein.

339.    Upon information and belief, Tenneco appointed and thus had a duty to monitor the Tenneco Benefits Committee and ensure that it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the DRiV Plan in the event the Tenneco Benefits Committee was not fulfilling those duties.

340.    In addition, as plan sponsors DRiV and Tenneco Automotive, at different times during the Class Period, had a duty to monitor the Tenneco Benefits Committee and ensure that it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the DRiV Plan in the event the Tenneco Benefits Committee was not fulfilling those duties.

341.    One or more of these Defendants had the authority and obligation to monitor the Tenneco Benefits Committee and were aware the Tenneco Benefits Committee had critical responsibilities as a fiduciary of the DRiV Plan.

60

342.    One or more of these Defendants had a duty to ensure the Tenneco Benefits Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the DRiV Plan's investments; and reported regularly to it or them.

343.    One or more of these Defendants breached their fiduciary monitoring duties by, among other things: (a) failing to monitor and evaluate the performance of the Tenneco Benefits Committee or have a system in place for doing so, standing idly by as the DRiV Plan suffered significant losses as a result of the Tenneco Benefits Committee's imprudent actions and omissions; (b) failing to monitor the processes by which the DRiV Plan's investments were evaluated; and (c) failing to remove the Tenneco Benefits Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the DRiV Plan, and caused the DRiV Plan to pay excessive recordkeeping fees and managed-account fees, all to the detriment of the DRiV Plan and the retirement savings of the DRiV Plan's participants.

344.    As a consequence of the foregoing breaches of the duty to monitor, the DRiV Plan suffered millions of dollars of losses.

345.    Had these Defendants complied with their fiduciary obligations, the DRiV Plan would not have suffered these losses, and participants of the DRiV Plan would have had more money available to them for their retirement.

346.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Tenneco, DRiV, and Tenneco Automotive are liable to restore to the DRiV Plan all losses caused by their failure to adequately monitor the Tenneco Benefits Committee.

347. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**Fourth Claim for Relief: Failure to Adequately Monitor Other Fiduciaries as to the Tenneco Plan**

348. Plaintiffs reallege and incorporate by reference all other allegations in this Amended Complaint as if fully set forth herein.

349. Upon information and belief, Tenneco appointed and thus had a duty to monitor the Tenneco Benefits & Pension Investment Committee ("Tenneco B&PI Committee") and ensure it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Tenneco Plan in the event the Tenneco B&PI Committee was not fulfilling those duties.

350. In addition, as plan sponsors, Tenneco Automotive and Federal-Mogul Powertrain LLC, at different times during the Class Period, had a duty to monitor the Tenneco B&PI Committee and ensure that it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Tenneco Plan in the event the Committee was not fulfilling those duties.

351. One or more of these Defendants had the authority and obligation to monitor the Tenneco B&PI Committee and were aware the Tenneco B&PI Committee had critical responsibilities as a fiduciary of the Tenneco Plan.

352. One or more of these Defendants had a duty to ensure the Tenneco B&PI Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Tenneco Plan's investments; and reported regularly to it or them.

353.    One or more of these Defendants breached their fiduciary monitoring duties by, among other things: (a) failing to monitor and evaluate the performance of the Tenneco B&PI Committee or have a system in place for doing so, standing idly by as the Tenneco Plan suffered significant losses as a result of the Tenneco B&PI Committee's imprudent actions and omissions; (b) failing to monitor the processes by which the Tenneco Plan's investments were evaluated; and (c) failing to remove the Tenneco B&PI Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Tenneco Plan, and caused the Tenneco Plan to pay excessive recordkeeping fees, all to the detriment of the Tenneco Plan and the retirement savings of the Tenneco Plan's participants.

354.    As a consequence of the foregoing breaches of the duty to monitor, the Tenneco Plan suffered millions of dollars of losses.

355.    Had these Defendants complied with their fiduciary obligations, the Tenneco Plan would not have suffered these losses, and participants of the Tenneco Plan would have had more money available to them for their retirement.

356.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Tenneco, Tenneco Automotive, and Federal-Mogul Powertrain LLC are liable to restore to the Tenneco Plan all losses caused by their failure to adequately monitor the Tenneco B&PI Committee.

357.    In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

### PRAYER FOR RELIEF

Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

(a)     A determination that Plaintiffs may proceed on behalf of the Plans, in accordance with ERISA;

(b)     A determination that this action may proceed as a class action under Rule 23(b)(1) or, in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

(c)     Designation of Plaintiffs as Class Representatives (including plaintiffs Ryan Frayer and Tanika Parker as class representatives for the DRiV Plan Subclass and plaintiff Andrew Farrier as class representative for the Tenneco Plan Subclass, to the extent subclasses are necessary) and designation of Plaintiffs' counsel as Class Counsel;

(d)     An order certifying the proposed Class (including subclasses as necessary);

(e)     A declaration that Defendants, and each of them, have breached their fiduciary duties under ERISA;

(f)     An order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits that the participants would have made if Defendants had fulfilled their fiduciary obligations;

(g)     Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

(h)     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

(i)     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of the Plans' fiduciaries deemed to have breached their fiduciary duties;

(j)     An award of pre-judgment interest;

(k)     An award of costs pursuant to 29 U.S.C. § 1132(g);

(l)     A service award to the class representatives;

(m)     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund

doctrine; and

(n)     Such other and further relief as the Court deems equitable and just.

E. B. Chiles IV, Ark. Bar No. 96179
Andrew S. Dixon, Ark. Bar No. 2019193
QUATTLEBAUM, GROOMS & TULL PLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
(P) 501.379.1734 | (F) 501.379.1701
cchiles@qgtlaw.com
adixon@qgtlaw.com

Boyd A. Byers, KS #16253 (Admitted *Pro Hac*)
Alexandra Rose, KS #27247 (Admitted *Pro Hac*)
Emily L. Matta, KS #28596 (Admitted *Pro Hac*)
FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy, Suite 100
Wichita, Kansas 67206-4466
(P) 316.291.9716 | (F) 316.771.6011
bbyers@foulston.com
nrose@foulston.com
ematta@foulston.com

Scott C. Nehrbass, KS #16285 (Admitted *Pro Hac*)
FOULSTON SIEFKIN LLP
7500 College Blvd. Suite 1400
Overland Park, KS 66210-4041
(P) 913.253.2144 | (F) 913.498.2101
Email: snehrbass@foulston.com

*Counsel for Plaintiffs and the Putative Class*

65